## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MAINE LOBSTERMEN'S ASSOCIATION,

*Plaintiff-Appellant*,

STATE OF MAINE DEPARTMENT OF MARINE RESOURCES; MASSACHUSETTS LOBSTERMEN'S ASSOCIATION; DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKS; LOCAL LODGE 207,

*Intervenors-Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY OF COMMERCE; JANET COIT, IN HER OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR FOR FISHERIES,

*Defendants-Appellees*,

CONSERVATION LAW FOUNDATION; CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE,

*Intervenors-Appellees.*

No. 22-5238, consolidated with Nos. 22-5244, 22-5245, 22-5246

## UNDERLYING DECISIONS FROM WHICH APPEAL ARISES

Pursuant to the Court's September 15, 2022 order, appellant Maine Lobstermen's Association encloses copies of the order and memorandum opinion underlying this appeal.  These are:

1. The district court's September 8, 2022 order granting Defendants' and Intervenor-Defendants' cross-motions for summary judgment.

2.  The district court's September 8, 2022 memorandum opinion issued with those orders.

Respectfully submitted,

October 17, 2022

/s/ Paul D. Clement

Paul D. Clement
*Counsel of Record*
Andrew C. Lawrence
James Y. Xi
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 20005
(202) 742-8900
paul.clement@clementmurphy.com
*Counsel for Plaintiff-Appellant*

/s/Jane C. Luxton

Jane C. Luxton
Lewis Brisbois Bisgaard & Smith
2112 Pennsylvania Ave. Suite 500
Washington, DC 20037
(202) 558-0659
jane.luxton@lewisbrisbois.com
*Counsel for Plaintiff-Appellant*

/s/ Mary Anne Mason

Mary Anne Mason
Chief Legal Officer of Maine
Lobstermen's Association
2 Storer St. Suite 203
Kennebunk, ME 04043
(202)262-2424
maryanne@mainelobstermen.org
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 17, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MAINE LOBSTERMEN'S ASSOCIATION, INC.,** | |
|      **Plaintiff,** | |
|      **and** | |
| **STATE OF MAINE, DEPARTMENT OF MARINE RESOURCES,** | |
|      **Intervenor-Plaintiff,** | |
|      **and** | |
| **MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.,** | |
|      **Intervenor-Plaintiff,** | |
|      **and** | |
| **DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 207,** | **Civil Action No. 21-2509 (JEB)** |
|      **Intervenor-Plaintiff,** | |
|      **v.** | |
| **NATIONAL MARINE FISHERIES SERVICE,** *et al.*, | |
|      **Defendants,** | |
|      **and** | |
| **CONSERVATION LAW FOUNDATION,** *et al.*, | |
|      **Intervenor-Defendants.** | |

## **ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1.  Defendants' [48] and Intervenor-Defendants' [46] Cross-Motions for Summary

    Judgment are GRANTED;

2.  Plaintiff's [42] and Intervenor-Plaintiffs' [41, 43] Motions for Summary Judgment

    are DENIED; and

3.  Judgment is ENTERED in favor of Defendants.

                                                    /s/ *James E. Boasberg*
                                                    JAMES E. BOASBERG
                                                    United States District Judge

Date:  September 8, 2022

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MAINE LOBSTERMEN'S ASSOCIATION, INC.,** | |
| **Plaintiff,** | |
| **and** | |
| **STATE OF MAINE, DEPARTMENT OF MARINE RESOURCES,** | |
| **Intervenor-Plaintiff,** | |
| **and** | |
| **MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.,** | |
| **Intervenor-Plaintiff,** | |
| **and** | |
| **DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 207,** | **Civil Action No. 21-2509 (JEB)** |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **NATIONAL MARINE FISHERIES SERVICE,** *et al.,* | |
| **Defendants,** | |
| **and** | |
| **CONSERVATION LAW FOUNDATION,** *et al.,* | |
| **Intervenor-Defendants.** | |

## **MEMORANDUM OPINION**

"Consider the Lobster," David Foster Wallace implored in an eponymous 2004 essay. In a variation on his theme, Plaintiffs today entreat the Court to consider the lobstermen. They do so as Defendant, the National Marine Fisheries Service, attempts a fraught balancing act: it seeks to protect the endangered North Atlantic right whale, while still allowing operation of the federal lobster fisheries that threaten the whale. In its latest foray, NMFS issued a Biological Opinion in 2021 that both set new targets for reducing right-whale mortality and also concluded that the fisheries' operation would not jeopardize the whales and so authorized them. Two months ago, in a suit brought by conservation groups, this Court invalidated the BiOp, holding that it violated two federal statutes by not being sufficiently protective of the right whale. Now Plaintiffs — two lobstering associations, a lobstermen's union, and the State of Maine — advance from the other side. Their suit contends that the same BiOp overstates the risks lobstering poses to the whale and consequently overregulates the industry. The parties, including conservation groups that have intervened on the side of Defendants, have now filed Cross-Motions for Summary Judgment.

Siding with the agency, the Court holds that the challenged portions of the BiOp survive under the deferential arbitrary-and-capricious standard of review. NMFS reasonably explained how it estimated the right-whale population and modeled that population into the future, drawing on what it rationally assessed was the best available data and submitting its methods for peer review. That is all that the Administrative Procedure Act requires. Neither the agency's BiOp, nor its Conservation Framework, nor its Final Rule implementing conservation measures was therefore arbitrary in the ways that Plaintiffs challenge. The Court will accordingly deny Plaintiffs' Motions for Summary Judgment and grant Defendants'.

## I.     Background

The Court in July canvassed the relevant background in great detail in <u>Center for</u>

<u>Biological Diversity v. Raimondo</u> (<u>CBD</u>), No. 18-112, 2022 WL 2643535 (D.D.C. July 8, 2022).

It will here refresh some relevant particulars but directs interested readers to that Opinion for

more context.

### A.  <u>Statutory Framework</u>

The dispute in this case derives principally from the Endangered Species Act, 16 U.S.C.

§§ 1531–1544.  Under the Act, federal agencies must ensure that their actions do not jeopardize

designated endangered species.  <u>CBD</u>, 2022 WL 2643535, at *4 (citing 16 U.S.C § 1536(a)(2)).

When a proposed federal action would affect an endangered species, the agency proposing the

action (the "action agency") must consult with an expert agency (the "consulting agency").  <u>Id.</u>

(citing 50 C.F.R. § 402.14(e)).  The consulting agency then issues a Biological Opinion, or BiOp,

assessing the effects of the proposed action.  <u>Id.</u>  In this case, different divisions of NMFS served

as the action and consulting agencies: its Sustainable Fisheries Division was the action agency,

and its Protected Resources Division was the consulting agency.  <u>Id.</u> at *3; <u>see also</u> ECF No. 61

(Joint Appendix), Attach. 2 (Volume 2), at 183, 200 (BiOp 1660, 1677).

A BiOp can come in one of two flavors.  A "jeopardy" BiOp concludes that the proposed

action is "likely to jeopardize the continued existence of a listed species"; a "no-jeopardy" BiOp

concludes that it is not.  <u>See</u> 16 U.S.C. § 1536(a)(2).  If the consulting agency issues a jeopardy

BiOp, the action agency must either implement reasonable and prudent alternatives that the

consulting agency describes, terminate the action altogether, or seek an exemption for the action.

<u>CBD</u>, 2022 WL 2643535, at *4 (quoting <u>United States Fish & Wildlife Serv. v. Sierra Club, Inc.</u>,

141 S. Ct. 777, 784 (2021)).  If the consulting agency instead issues a no-jeopardy BiOp, the

proposed action may proceed.  A no-jeopardy BiOp must (among other things) include an

"Incidental Take Statement" identifying and authorizing the level of mortality and serious injury,

called M/SI, that the action is expected to cause.  Id. (citing 50 C.F.R. § 402.14(i)).  In all events,

and important for this case, the consulting agency must "use the best scientific and commercial

data available" in its BiOp.  See 16 U.S.C. § 1536(a)(2).

Also relevant is the Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1421.  That

statute provides separate but related protections for marine mammals, two of which are pertinent

here.  First, the MMPA prevents killing protected mammals incident to fishing operations unless

the M/SI anticipated from those fisheries will have a "negligible impact" on the species.  See 16

U.S.C. § 1371(a)(5)(E)(i).  Second, the Act requires the Secretary of Commerce (here, through

NMFS) to impose a take-reduction plan for each endangered marine species that interacts with a

commercial fishery; those plans, developed by take-reduction teams, aim to minimize M/SI of

protected species that interact with federal fisheries.  See 16 U.S.C. § 1387(f)(2); see also CBD,

2022 WL 2643535, at *2–3.  NMFS implements and amends those take-reduction plans through

rulemakings, resulting in promulgated Final Rules.  See 86 Fed. Reg. 51,970 (Sept. 17, 2021)

(Rule at issue here).  In the short term, the MMPA requires that those reduction plans set the

agency on track to reduce M/SI from commercial fishing, within six months of the Rule, to

below a species' potential biological removal level (PBR) — a figure that identifies the

maximum number of animals that may be killed while still allowing a population to remain

stable.  See 16 U.S.C. § 1387(f)(2); see also id. § 1362(20) (defining PBR and factors that

produce it).  In the longer term, the statute requires that the plans set the agency on track to

reduce M/SI within five years of the Rule "to insignificant levels approaching a zero mortality

and serious injury rate."  Id. § 1387(f)(2).

B.  Factual and Procedural History

The North Atlantic right whale has been listed as endangered for as long as the ESA has been law.  CBD, 2022 WL 2643535, at *5.  The two principal causes of right-whale deaths are vessel strikes and entanglement in fishing gear.  Id.  Over the past decade in particular, the leviathan's numbers have dwindled — as of 2019, the population was estimated at just 368 whales.  Id.  Due to those low numbers, the current PBR for the right whale sits at 0.8 M/SI per year.  See 86 Fed. Reg. at 51,971.  In other words, for the right-whale population to remain stable, humans must kill fewer than one right whale per year.

The present dispute arrives here with a long history, which the Court has detailed before and briefly recaps here.  See generally CBD, 2022 WL 2643535, at *5–7.  It began when NMFS's action agency — its Sustainable Fisheries Division — proposed an action that NMFS defined as both authorizing a series of federal fisheries, including the lobster fishery, and also implementing a Conservation Framework designed to reduce the fisheries' impact on right whales.  See J.A. Vol. 2 at 540 (BiOp 2017) (defining action as "including the implementation of the Framework"); see also id. at 48, 49 (BiOp 229, 259) (letters on proposing Framework as part of action).  In 2014, NMFS's consulting agency — its Protected Resources Division — issued a no-jeopardy BiOp authorizing that proposed action.  A group of conservation plaintiffs — the Center for Biological Diversity, Defenders of Wildlife, and Conservation Law Foundation — challenged that BiOp in 2018, contending that it failed to include an Incidental Take Statement.  Agreeing, this Court invalidated the BiOp in 2020 but stayed relief until May 31, 2021, in order to let NMFS complete the issuance of a new BiOp.  CBD, 2022 WL 2643535, at *5 (citing Ctr. for Biological Diversity v. Ross, No. 18-112, 2020 WL 1809465, at *10 (D.D.C. Apr. 9, 2020);

and <u>Ctr. for Biological Diversity v. Ross</u>, 480 F. Supp. 3d 236, 240 (D.D.C. 2020)).  The

agency's efforts came to fruition in 2021.

Still dissatisfied with the updated version, those conservation plaintiffs returned to this

Court and succeeded once again, as the Court invalidated the 2021 BiOp.  It concluded that,

although the new BiOp did include an Incidental Take Statement, "NMFS violated the ESA by

failing to satisfy the MMPA's 'negligible impact' requirement before setting the authorized level

of lethal take in its ITS."  <u>CBD</u>, 2022 WL 2643535, at *1.  In other words, "[t]o . . . claim to

authorize zero lethal take while in fact anticipating that such take will continue to occur runs

counter to the evidence before the agency and is arbitrary and capricious."  <u>Id.</u> at *12 (internal

quotation omitted).

In addition, the agency also promulgated a Final Rule to implement its take-reduction

plan under the MMPA, which contained various right-whale conservation measures.  <u>See</u> 86 Fed.

Reg. 51,970.  The plaintiffs challenged that Rule as well, arguing that it too was insufficiently

whale protective because it did not aim to reduce right-whale M/SI below the PBR within six

months.  Once more agreeing with the plaintiffs, the Court also invalidated the Rule.  Rather than

immediately shutter the American lobster fishery for these two shortcomings, however, the Court

stayed issuance of a remedy pending further briefing.  <u>CBD</u>, 2022 WL 2643535, at *20.  That

briefing is currently ongoing.

The conservation groups are not the only ones unhappy with the agency.  Playing

Charybdis to their Scylla, lobstermen are equally displeased — but their protest is that NMFS

has been <u>too</u> restrictive on the fishery in its decisions.  As a result, Plaintiff Maine Lobstermen's

Association (MELA) filed this Complaint against NMFS in September 2021, and three

Intervenor-Plaintiffs — the Massachusetts Lobstermen's Association (MALA), the Maine

Department of Marine Resources (ME DMR), and the Maine Lobstering Union (MLU) — joined

later that year.  The same three conservation groups from the companion case intervened as

Defendants.  Plaintiffs attack the BiOp and the associated Conservation Framework as arbitrary

and capricious, arguing that it commits a slew of scientific errors that lead it to overstate the

impact of their fishery on the right-whale population.  They also add a challenge to the Rule,

arguing that it relies on the unreasonably pessimistic BiOp and thus should be invalidated.

Because NMFS overstated their industry's risk to right whales, they contend, the Rule imposes

some needless and draconian risk-reduction measures — *e.g.*, restrictions on the number of

vertical fishing lines in certain areas, seasonal closures, and the requirement that fishing lines

contain weak links that whales can break free from.  See 86 Fed. Reg. at 51971–74.

Three Plaintiffs (MELA, MLU, and ME DMR) and all Defendants (Federal Defendants

and Intervenor conservation groups) now cross-move for summary judgment.  The parties seek

summary judgment on the same three counts, challenging the BiOp, Conservation Framework,

and Final Rule as arbitrary and capricious.  (MELA raises a fourth count in its Complaint but

does not seek summary judgment on it here.  See ECF No. 42 (MELA Motion for Summary

Judgment) at 2.)  Plaintiffs ultimately seek remand without vacatur so that the agency can rewrite

the BiOp, Framework, and Rule.  If the Court agrees and orders remand, they believe that the

agency will remove the burdens from the Final Rule and avoid imposing new ones.

Although the Court initially raised concerns about whether the case should be stayed

pending resolution of the remedy in CBD, it believes it wiser to decide the competing Motions

now.  See Minute Order of Aug. 18, 2022.

## II.      Legal Standard

The APA provides the standard of review for Plaintiffs' claims, although some are

brought under the APA and ESA and others invoke the APA alone.  Nat'l Ass'n of Home

Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005) (APA provides standard of review in ESA

cases).  "[W]hen a party seeks review of agency action under the APA [before a district

court], . . . the district judge sits as an appellate tribunal."  Rempfer v. Sharfstein, 583 F.3d 860,

865 (D.C. Cir. 2009) (second alteration in original) (quoting Am. Bioscience, Inc. v. Thompson,

269 F.3d 1077, 1083 (D.C. Cir. 2001)).  In other words, "[t]he entire case on review is a question

of law."  Id. (quoting Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir.

1993)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if, for

example, the agency "entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

29, 43 (1983).  "'The scope of review [in an APA case] is narrow and a court is not to substitute

its judgment for that of the agency,' provided the agency has 'examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action including a rational connection between the

facts found and the choice made.'"  Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C.

Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43).

Under the deferential § 706(2)(A) standard, "[a] party seeking to have a court declare an agency action to be arbitrary and capricious carries 'a heavy burden indeed.'" Wisconsin Valley Improvement v. FERC, 236 F.3d 738, 745 (D.C. Cir. 2001) (quoting Transmission Access Policy Study Group v. FERC, 225 F.3d 667, 714 (D.C. Cir. 2000)). While the court "may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (citation omitted) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); then citing Colo. Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)). It is only these "certain minimal standards of rationality" to which a reviewing court holds an agency. Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (*en banc*)).

## III.   Analysis

The Court's analysis begins with two threshold issues concerning Plaintiff-Intervenor MLU. It then separately examines the three counts relating to, respectively, the 2021 BiOP, the Conservation Framework, and the Final Rule.

### A.   MLU Threshold Issues

NMFS first trains its sights on MLU's briefing, contending both that the group has no standing to sue here and that it improperly raises issues at summary judgment that do not appear in its (or any) Complaint.

#### 1.   *Standing*

MLU self-evidently has standing. When a "plaintiff is himself an object of the action (or foregone action) at issue[,] . . . there is ordinarily little question that the action or inaction has

9

caused him injury, and that a judgment preventing or requiring the action will redress it." Lujan
v. Defs. of Wildlife, 504 U.S. 555, 561–62 (1992).  Accordingly, "[i]n many if not most cases
the petitioner's standing to seek review of administrative action is self-evident." Sierra Club v.
EPA, 292 F.3d 895, 899–900 (D.C. Cir. 2002).  Here, MLU's standing so qualifies.  Its motion to
intervene, which the Court granted, described in detail how MLU "is comprised only of active
and licensed Maine lobstermen and exists to protect the interests of only licensed lobstermen and
sternmen."  ECF No. 26 (MLU Motion to Intervene) at 3.  And in a section titled "The MLU Has
Standing," the entity underscored that a decision for Defendants would cause economic injury to
its members, while a decision for Plaintiffs would insulate members from those harms. Id. at
10–11.  It is difficult to imagine a more textbook case of standing than a lobstermen's union
challenging a regulation that it argues imposes arbitrary and unlawful burdens on lobstermen.

The agency's only real counter is that MLU "has not submitted a single declaration"
supporting standing, and then when MLU did so in its Reply (a declaration from CBD that it had
referenced in its Motion to Intervene), that its declaration is invalid because it predates the
challenged rule. See ECF No. 48 (Gov't MSJ) at 10; ECF No. 60 (Gov't Reply) at 3.  But given
that MLU's standing is self-evident, its citations to a declaration only run up the score.  The
Court sees no issue with a party's referencing a declaration it made in a related case to describe
factual propositions about itself; in any event, even without relying on the declaration, the Court
views it as plain that MLU has standing.

2.   *Issues Raised*

NMFS fares better on its next contention.  As a baseline rule, "a plaintiff may not assert
new claims in a motion for summary judgment." McKinney v. USPS, 75 F. Supp. 3d 266, 279
(D.D.C. 2014); see also Taylor v. Mills, 892 F. Supp. 2d 124, 137–38 (D.D.C. 2012) (collecting

cases).  One wrinkle arises where both parties "impliedly consent" to bring in issues not raised in a complaint at the summary-judgment stage.  Whether the Federal Rules permit such constructive amendment of the pleadings is an "open question" in our Circuit.  Indep. Petroleum Ass'n of Am. v. Babbitt, 235 F.3d 588, 596 (D.C. Cir. 2001).  Protesting that a plaintiff did not plead a claim, however, necessarily bars finding such implied consent.  Taylor, 892 F. Supp. 2d at 138.

MLU raises several issues for the first time in its summary-judgment briefing, and NMFS's outcry manifests its lack of consent.  See Gov't MSJ at 11-13; Gov't Reply at 4 n.2. Those issues include challenges related to the Regularly Flexibility Act, the MMPA's purposes, and the composition of the take-reduction team.  See Gov't MSJ at 11-13.  As those claims do not fairly fall within the scope of MLU's Complaint (nor indeed of any Plaintiff's), the Court will not consider them here.

### B. Count I: The 2021 BiOp

Moving to the actually pled causes of action, the Court begins with Plaintiffs' first and most substantial count: that the 2021 BiOp is arbitrary and capricious because it made a slew of scientific errors that caused it to overestimate the lobster fishery's effects on the right whale. This is a case where the deferential arbitrary-and-capricious review standard matters.  The Court need not and does not decide here that the agency's approach to the multiple issues in play was the only, or even best, way of analyzing the data or resolving uncertainty.  Indeed, as circumstances change and new data become available, the agency can and must continually update its assessments.  At this juncture, however, the Court is satisfied that NMFS suitably considered the data available at the time of its action and reasonably explained its scientific conclusions.

1. *Benefit of the Doubt*

MELA begins with a cross-cutting challenge: that NMFS violated the ESA by resolving

scientific uncertainties not by applying the "best scientific and commercial data available," but

with an erroneous substantive presumption "in favor of the species."  ECF No. 42 (MELA MSJ)

at 14 (first citing 16 U.S.C. § 1536(a)(2), then citing J.A. Vol. 2 at 405 (BiOp 1882)).  MELA

accordingly argues that all of the agency's substantive analyses, many of which are the subjects

of specific challenges below, were arbitrary and capricious because they were infected by an

agency policy of disregarding scientific data.

The Court disagrees.  The agency explained that its analyses were "based upon the best

available commercial and scientific data."  J.A. Vol. 2 at 405 (BiOp 1882).  Recognizing that

"[d]ata are limited," it noted that "the best available information may include a range of values."

Id.  It thus observed, "[W]e are often forced to make assumptions to overcome the limits in our

knowledge."  Id.  Only in those circumstances — where ambiguous or incomplete data left the

agency with a judgment call — did the agency offer that it "generally select[ed] the value that

would lead to conclusions of higher, rather than lower, risk to endangered or threatened species."

Id.  The agency did not purport to displace the best available data, only to supplement it where

the data ran out.  (As discussed below, Plaintiffs in their subsequent claims challenge whether

the agency actually did rely on the best available data, but that is a separate issue.)

NMFS's approach here is consistent with Oceana v. Evans, 384 F. Supp. 2d 204 (D.D.C

2005), a case the parties discuss at length.  There, a court in this district held that the agency may

not displace its scientific assessment with an approach that protects a species but that, "according

to its scientists, would be lacking in support."  Id. at 228.  That is not what NMFS did here.  The

agency did not use a substantive presumption to displace scientific judgment; it purported only to

resolve uncertainty when the best science left it a range of possible options. The agency's approach was rational and thus passes muster under arbitrary-and-capricious review. See also Bldg. Indus. Ass'n of Superior California v. Norton, 247 F.3d 1241, 1247 (D.C. Cir. 2001) (emphasizing that merely pointing out "occasional imperfections," without identifying hard data an agency missed, does not render agency action arbitrary and capricious).

The parties also offer arguments about whether this approach is consistent with the ESA's requirement that the agency "use the best scientific and commercial data available" to assess effects that are "reasonably certain" to occur in its BiOp. See 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.17. To that end, they clash over language in the agency's internal Consultation Handbook, which states that "[w]here significant data gaps exist," the agency may "develop the biological opinion with the available information giving the benefit of the doubt to the species." ECF No. 61-4 (J.A. Vol. 4) at 101 (BiOp 68780). They dispute in particular whether that passage authoritatively interprets the statute and so merits Chevron deference. Compare MELA MSJ at 14–20 with Gov't MSJ at 13–17. The Court need not wade into this deference debate because, in all events, the agency's stated approach is consistent with the ESA and so not arbitrary and capricious. As discussed, NMFS does require that its assessments be based on the best available data — which is all that the statute requires. Where that best data left the agency with a range of reasonably likely options, it simply chose the more species-protective result from the range the data allowed for.

To be sure, the Court does not hold that the ESA compels the agency's conservative policy towards resolving such scientific uncertainty, and NMFS may revisit that policy at any time. The Court here holds only that its present approach was not arbitrary and capricious.

2. *US/Canada Allocation*

Plaintiffs' first specific challenge is to the BiOp's 50/50 allocation of right-whale entanglements of unknown origin between the United States and Canada. The lobstermen argue that the evidence required the agency to allocate more entanglements to Canadian waters, and that its failure to do so arbitrarily and capriciously inflated the number of right-whale deaths that the American fisheries caused and thus increased the risk-reduction measures that those fisheries must take. See ECF No. 34 (MLU Compl.), ¶ 85; ECF No. 41 (MLU MSJ) at 23–25; ECF No. 1 (MELA Compl.), ¶ 95; MELA MSJ at 22–27; ECF No. 30 (ME DMR Compl.), ¶ 76; ECF No. 43 (ME DMR MSJ) at 11–16.

The Court holds otherwise. While the agency could have taken Plaintiffs' approach, it was not obligated to do so. NMFS examined the relevant data and in the face of great uncertainty articulated a sufficient connection between that data and its chosen approach; that is all it was required to do. Indeed, the First Circuit just so held in a related case. See Dist. 4 Lodge v. Raimondo, 40 F.4th 36, 41 (1st Cir. 2022) (holding 50/50 U.S./Canada apportionment was not arbitrary and capricious).

In a portion of the 2021 BiOp titled "Estimating Interactions with and Serious Injury/Mortality of North Atlantic Right Whales," the agency explained that of the 48.5 right-whale M/SI incidents between 2010 and 2018 caused by fishing-gear entanglement, 7.75 were attributable to Canadian waters, 2 were attributable to U.S. waters, and the remaining 38.75 were not attributable to either country. See J.A. Vol. 2 at 414-15 (BiOp 1891–92). The agency thus faced the task of apportioning those remaining 38.75 M/SI entanglements.

In a paragraph under the heading "Unknown Country Apportionment," it determined that it would attribute half to the United States and half to Canada. Recognizing that the limited data

14

showed more observed entanglements in Canada than in the U.S., NMFS nonetheless explained

its decision as resting on several considerations.  It began with its guidance document for

assessing marine-mammal stocks, which calls for allocating unidentified M/SI based on the

percentage of time right whales appear in each country's waters — an approach that "likely

would have assigned a higher than 50 percent portion of unknown sources to U.S. fisheries."

J.A. Vol. 2 at 415–16 (BiOp 1892–93).  The agency then observed, however, that right whales

increasingly frequent Canadian waters and that it thus lacked current and precise data on the

amount of time right whales spend on each side of the border.  Id. at 416 (BiOp 1893).  The

agency consequently deviated downward to a 50/50 split, an approach it noted that the take-

reduction team had used two years earlier, in 2019.  Id. at 416 & n.27 (BiOp 1893 & n.27).  (The

agency also explained that as the data from 2019 was not yet complete, it was not included in the

analysis.  Id. at 414 n.26 (BiOp 1891 n.26).)

NMFS considered Plaintiffs' preferred approach of apportioning M/SI incidents based on

observed data, which would apply the ratio of 7.75 Canadian to 2 American M/SI entanglements

for all those unattributable.  But the agency decided against it.  While noting that heavier

Canadian gear used for fishing snow crabs is more lethal than American buoy lines used for

lobstering, NMFS nonetheless concluded that the large number of buoy lines in U.S. waters,

combined with substantial uncertainty on the effects of the countries' mitigation measures,

suggested a 50/50 split.  For good measure, the agency submitted its approach for peer review by

the Center for Independent Experts, which concluded that given the limited data available,

NMFS's approach was "reasonable."  Id. at 416 & n.27 (BiOp 1893 & n.27); see also J.A. Vol. 4

at 167–68 (BiOp 74464–65) (CIE peer-review summary).  This analysis was not arbitrary and

capricious.  See Dist. 4 Lodge, 40 F.4th at 41.

The Court acknowledges that NMFS could have more comprehensively addressed Plaintiffs' evidence that climate change has caused right whales to spend more time in Canadian waters — either altering its models to account for those migration patterns or explaining more thoroughly why it needed not do so.  The Court is cognizant, moreover, of the data that suggest that the whales are moving north; indeed, the agency's own peer-review report identifies "a clear recent shift in the spatial distribution" of the right-whale population towards Canada.  See J.A. Vol. 4 at 167 (BiOp 74464).  If new data continue supporting this trend, the agency may in the future need to either update its modeling or say more about why it has not.

At the end of the day, NMFS here considered the relevant data and offered a rational and peer-reviewed explanation for its approach.  As attempting to trace the location of mortal entanglements is quintessentially murky water, the Court declines to displace the expert agency's judgment.  See Dist. 4 Lodge, 40 F.4th at 41 ("The Agency's explanation and reliance on the peer-review panel is enough to pass arbitrary-and-capricious review; we do not require perfect accuracy.").

### 3.  *Unknown-Origin Entanglement Allocation*

Plaintiffs next object to the BiOp's allocation of M/SI entanglements where the type of gear trapping the whale — namely, either the "trap/pot" gear used to catch lobster or the "gillnet" gear employed to catch other fish — cannot be determined.  The agency decided to apportion 100% of these U.S.-based M/SI to trap/pot gear, a decision that Plaintiffs argue was arbitrary and capricious.  See MLU Compl., ¶ 85; MLU MSJ at 25–26; MELA Compl., ¶ 95; MELA MSJ at 27–30; ME DMR Compl., ¶ 76; ME DMR MSJ at 16–18.

As with the U.S./Canada allocation above, the agency here faced the difficult gap-filling task of assigning M/SI of unknown provenance to a likely source.  As there, the agency did all it

was required to do: analyze the relevant facts and articulate a rational connection between those facts and its conclusion.

NMFS wrestled with how to allocate M/SI from unknown gear across three pages of its BiOp, spanning six paragraphs and a table. See J.A. Vol. 2 at 416–18 (BiOp 1893–95). Based on the available data and its expert analysis, the agency concluded that all such entanglements should be attributed to trap/pot fisheries for several reasons. First, it assessed that interactions with gillnets "may be more easily detected and identified on large whales"; consequently, unidentified interactions are more likely to be from trap/pot gear. Id. at 417 (BiOp 1894). Second, the agency explained that the percentage of known trap/pot interactions that cause M/SI (53%) is substantially higher than the percentage of known gillnet interactions that cause M/SI (29%). Id. That is because right whales can free themselves from gillnets far more easily than they can from the vertical lines most prevalent in trap/pot gear. While recognizing that it had limited data, given the low total number of interactions with known causes, the agency thus assessed that trap/pot lines pose a disproportionate risk of M/SI. Id. Third, NMFS explained that vertical lines are the principal cause of M/SI injury: 21 of 22 cases of M/SI where gear was present (but the precise type of that gear was unidentifiable) involved vertical-line gear. Id. at 416 (BiOp 1893). That fact is important because of the agency's fourth and most significant conclusion: 99.7% of vertical lines in the relevant area are from trap/pot lines. Id. at 417–18 (BiOp 1894–95). Noting that right whales interact with vertical lines from gillnets and trap/pot gear in rough proportion to their presence in the water, the agency reasoned that because essentially all of the fatal type of lines in the relevant areas are trap/pot lines, it could reasonably assign mortality from unknown sources to such lines. Id. NMFS considered using the ratio of

confirmed M/SI from gillnet to that from trap/pot gear, but for those reasons concluded it was far more likely that trap/pot lines were responsible for unidentified M/SI.  Id.

The Court declines to disturb that reasoned analysis.  While Plaintiffs object to NMFS's approach, they are unable to identify specific reliable data that the agency overlooked or other material gaps in its reasoning.  As before, the agency was not obligated to approach the problem the way it did, but the Court holds that its conclusions were not arbitrary and capricious.

### 4.  *Cryptic Mortality*

Continuing their volley of objections, Plaintiffs next contend that the agency erred in calculating "cryptic mortality," a term for right-whale deaths where no carcass is recovered. MLU first challenges wholesale the agency's use of cryptic mortality, arguing that any apparent deaths could in actuality be the result of right whales' migrating to other regions or factors other than death.  In the main, all Plaintiffs also contend that the agency's cryptic-mortality analysis inappropriately blamed humans and thus did not sufficiently account for right whales' dying from natural causes.  See MLU Compl., ¶ 85; MLU MSJ at 26–27; MELA Compl., ¶ 95; MELA MSJ at 30–31; ME DMR Compl., ¶ 76; ME DMR MSJ at 18–20.

The lobstermen again pull up an empty trap.  Starting with the wholesale challenge, the agency explained that the scientific literature indicates that accounting for only observed carcasses would understate the number of right-whale deaths.  See J.A. Vol. 2 at 411 (BiOp 1888).  To estimate cryptic mortality, the agency employed a rigorous, peer-reviewed method developed by leading right-whale researchers and based on record studies.  Id. at 411, 420 (BiOp 1888, 1897) (citing Pace *et al.* (2017), ECF. No 61-3 (J.A. Vol. 3) at 476–87 (BiOp 59974–85); Pace *et al.* (2021), J.A. Vol. 3 at 488–95 (BiOp 59986–93)).  MLU's critique — *viz.*, that the researchers forgot to account for whale migration — is little match for the agency's peer-

reviewed science.  See also J.A. Vol. 3 at 481 (BiOp 59979) (specifically assessing "[c]hanges in

habitat use patterns among North Atlantic right whales"); id. at 490 (BiOp 59988) (similar).

Closer, though still unsuccessful, is Plaintiffs' belief that the agency's projections failed

to account for "natural mortality," meaning death from natural causes.  In calculating cryptic

mortality, NMFS decided against including natural mortality in its projections, writing that

"there is little evidence showing this to be a cause of right whale mortality except at the calf

stage (Corkeron et al. 2018) [J.A. Vol. 2 at 837–48 (BiOp 17728–39)]."  J.A. Vol. 2 at 420

(BiOp 1897).  Plaintiffs make great hay over that line.  "[R]ight whales," MLU protests, "like all

mammals, are mortal."  MLU MSJ at 27.  That argument has some intuitive appeal; indeed, it

would seem an oversight if the government had assumed complete right-whale immortality

absent human intervention.

The agency, however, explained why natural mortality was not statically significant

enough to include in its analysis, and it cited a study so concluding.  See J.A. Vol. 2 at 420

(BiOp 1897) (describing "little evidence" that natural mortality has significant population

impacts, and citing Corkeron et al. 2018, J.A. Vol. 2 at 837–48 (BiOp 17728–39)).  That study

reasoned that whale populations are determined primarily by female mortality, of which humans

caused about 80% where cause of death is known.  See J.A. Vol. 2 at 844 (BiOp 17735).  That

percentage likely still underestimates total human impact, moreover, because it includes female

calves — "which are more prone to natural mortality."  Id.  As a result, the study concluded, "a

reasonable inference is that the vast majority of non-calf female [North Atlantic right whale]

mortality is anthropogenic [human caused]."  Id.; see also id. at 845 (BiOp 17736) ("[N]ecropsy

data over decades demonstrate that deaths of non-calf [North Atlantic right whales] are almost

entirely due to anthropogenic causes.").

Plaintiffs toss out several lines in response, none of which lands a fish.  First, they charge that, because the agency reasoned only that adult natural mortality was insignificant, it should have at least accounted for calf natural mortality.  This argument misunderstands how NMFS models right-whale populations.  The scientific literature generally considers calf death to be a non-addition to the population, rather than the death of a population member, because calves do not typically enter population counts until about six months old.  See J.A. Vol. 3 at 483 (BiOp 59981).  In addition, the agency explained that adult-female survival rates, not calf survival rates, are the key determinant of population dynamics.  See J.A. Vol. 2 at 96, 526 n.70 (BiOp 1018, 2003 n.70).

Second, Plaintiffs assert that the agency disregarded evidence that sharks and killer whales kill at least some right whales.  This argument too runs aground.  The agency's cited research, on the contrary, found that adult right whales are "almost entirely" killed by humans, not sharks.  See J.A. Vol. 2 at 845 (BiOp 17736).  And while Plaintiffs do identify a documented killer-whale attack in the record, even that attack was non-fatal.  See J.A. Vol. 3 at 87 (BiOp 30865) (noting right whale seen with killer-whale teeth marks, but not dead).

Finally, Plaintiffs fall back on the commonsense argument that whales are not immortal, and so the agency should have accounted for at least some natural death.  Put another way, the agency was wrong to assume zero natural mortality, be it from shark attacks, old age, or the like. Despite its intuitive appeal, this argument is insufficient to overcome NMFS's scientific judgment.  No one claims that whales are immortal.  Instead, the agency's analysis found simply that natural mortality does not constitute a statistically significant part of right-whale population change for the reasons discussed above.  The APA requires no more.

5. *Failure to Account for Harm-Reduction Measures*

The lobstermen next argue that the agency overestimated right-whale deaths because it neglected to consider various remedial measures already in place to protect the species. Plaintiffs emphasize the range of new whale-protective measures already in use: the requirement that vertical lines contain weak inserts designed to break under no more than 1,700 pounds of force, a ship-strike reduction program that lowers the speed limit of American vessels at certain times of year, and a range of Canadian protective measures. They contend that because the agency did not account for these measures, it overstates the right-whale mortality rate.

Plaintiffs come up empty here, too. To the extent that these measures prove effective, the agency hopes and expects that M/SI will drop, yet NMFS for now relied on the most current observable data it had. The problem for Plaintiffs is that the agency lacked data on these mitigation measures, and it thus explained that the most scientifically sound approach would be to not assume beyond the current data at this time. See J.A. Vol. 2 at 528 (BiOp 2005) (explaining that, "[g]iven the limited time these [Canadian] measures have been in effect as well as annual changes to and the dynamic nature of the measures, there is no way to quantitatively or qualitatively assess the benefit at this time"); see also id. at 414 n.26 (BiOp 1891 n.26) (explaining decision not to use incomplete 2019 data in modeling U.S./Canada migration). With respect specifically to weak rope, which MLU emphasizes, the agency explained that the effects of the intervention are untested but nonetheless incorporated as best as possible into agency modeling. See, e.g., J.A. Vol. 2 at 87 (BiOp 1009). While NMFS hopes that weak rope will prove effective in lowering M/SI in the future, which would help it meet the Conservation Framework's targets, at this stage, it declined to assume particular outcomes in its BiOp. Id.; see also id. at 112 (BiOp 1034). Under the arbitrary-and-capricious standard, the agency's

explanation is enough.  It rationally reasoned that, in the face of uncertainty, it could not assume

that mitigation measures would significantly alter its projections, while committing to continue

updating its assessments as the data required.

That last point bears double underscoring.  NMFS does not dispute that it is required to

use the latest data it has available, and to the extent that these mitigation measures result in

progress, the Court expects the agency to factor those results into its projections.  For the

moment, however, the agency simply did not have the data that Plaintiffs wish it had, and it

accordingly was not required to assume any effects it could not rigorously model.

### 6.  *Other Data Challenges*

Using their final lure, Plaintiffs challenge the data that NMFS used in its population

model predicting the female-right-whale population trajectory over the next fifty years.  Known

as the "Linden model," this agency modeling tool was subject to a Center for Independent

Experts peer review, which described it as "fit for the purpose of assessing future trends" and

concluded that it "represents the best scientific information available to evaluate how reductions

in serious injury and mortality will affect the population trajectory of female North Atlantic right

whales."  J.A. Vol. 2 at 21 (BiOp 180).  The lobstermen nonetheless argue that the agency model

did not draw from a long enough time period and attempted to project too far into the future

based on limited data.  See J.A. Vol. 2 at 94 (BiOp 1016) (agency responding to concerns in

comments).

This last lure catches no more fish than the others.  To begin, the Court emphasizes that

the agency's conclusions were peer-reviewed by independent expert scientists and found sound.

Those peer reviewers in particular concluded that using a longer period of time would make

projections overly optimistic, see J.A. Vol. 2 at 855 (BiOp 17997), and that the agency's choice

of time period was "the obvious and appropriate one to make." J.A. Vol. 3 at 16 (BiOp 22291).

That some experts proposed areas for improvement does not undercut the agency's chosen

approach. The peer reviewers found the agency's model to be complete given the available data;

unlike Plaintiffs, they did not fault the agency for not incorporating data that did not then exist.

Given that the Court does not presume to be a peer reviewer, absent clear holes in the agency's

data or reasoning, it will defer to the agency's "predictions, within its area of special expertise, at

the frontiers of science." Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103

(1983).

The lobstermen also challenge the agency's Decision Support Tool (DST), a statistical

modeling program that it used to calculate right-whale entanglement risk by considering line

density, distribution of whales, and threat per line. The DST was also peer-reviewed by a panel

of outside experts, who noted areas for future data collection but all concluded that the model

represents the current best available science. See J.A. Vol. 2 at 416 (BiOp 1893); J.A. Vol. 4 at

130, 182, 214 (BiOp 74427, 74479, 74511) (expert reviews); see also J.A. Vol. 4 at 144 (BiOp

74452) (summarizing). The First Circuit, moreover, has recently and exhaustively catalogued

why that tool and the data it relied on were not arbitrary and capricious. In District 4 Lodge v.

Raimondo, 40 F.4th 36 (1st Cir. 2022), that court carefully explained how the agency considered

all available information in its DST. This Court agrees with that well-reasoned analysis. It adds

only that Plaintiffs' challenges appear to be principally based on the premise that the agency's

studies and data were imperfect or incomplete. But that alone is not enough. As our Circuit has

held, the best scientific data available does not mean the best scientific data possible. Bldg.

Indus. Ass'n of Superior Cal. v. Norton, 247 F.3d 1241, 1246 (D.C. Cir. 2001). The record

shows that the agency reasonably analyzed these issues under the data constraints it faced; its product was accordingly not arbitrary and capricious.

The Court is also unpersuaded by various other claims that Plaintiffs float.  For instance, MELA offers a table that it contends shows that the agency made either miscalculations or misrepresentations in its analysis.  But NMFS rejoins that MELA's table covers a longer time horizon than its analysis did and includes more Canadian deaths than the agency did, and NMFS satisfactorily explained why it made different calculations.  Compare MELA MSJ at 22 with Gov't MSJ at 18–19.  For its part, MLU charges that the agency failed to conduct enough studies to get an accurate baseline, but, as discussed above, the arbitrary-and-capricious standard requires only that the agency reasonably analyze and explain available information.

The ideal BiOp, made with unlimited time and resources, would have explained certain points more thoroughly.  This is likely always the case for agency work.  NMFS's efforts here suffice.

C.  Count II: The Conservation Framework

Plaintiffs' first challenge argued that the agency overestimated the number of whales that the federal fisheries kill per year; their second asserts that NMFS also lowballed without reasoned explanation the number of whales that the federal fisheries could kill per year without jeopardizing the whale population.  Specifically, the lobstermen contend that the Conservation Framework arbitrarily commits the agency to reduce right-whale M/SI from federal fisheries to 0.136 whales per year by 2030, a number lower than the 0.8 M/SI per year that the agency assessed in its potential biological removal level (PBR) would allow the right-whale population to maintain stability.

Dispatching the conservation groups' antecedent reviewability challenge, the Court first holds that the Conservation Framework is reviewable as a part of the agency action approved in the 2021 BiOp.  On the merits, however, the Court concludes that NMFS's target number was not arbitrary and capricious.

        1.  *Reviewability*

To begin, the Conservation Framework is reviewable because it is part — indeed, a necessary part — of the agency action reviewed by the 2021 BiOp.  Recall that if a consulting agency finds that a proposed agency action is likely to jeopardize the continued existence of a species, it must issue a "jeopardy" BiOp (and then the action agency must either implement mitigatory measures, abandon the action, or seek an exemption).  CBD, 2022 WL 2643535, at *4.  By contrast, if the consulting agency finds an action creates no such hazard for the species, it shall issue a "no-jeopardy" BiOp.  Id.

Here, NMFS issued a "no-jeopardy" BiOp because it found that the proposed action authorizing the federal fisheries was not likely to jeopardize the right whale.  Yet the observant reader will note a curious fact: the agency made that finding notwithstanding its conclusions that the fisheries kill or injure 2.69 right whales per year, and that only 0.8 right whales may be killed or seriously injured annually for the population to remain stable.  Compare J.A. Vol. 2 at 674 (BiOp 2151) (estimating that "without further action, the federal fisheries are anticipated to result in the death of approximately an annual average of 2.69 right whales") with 86 Fed. Reg. at 51,971 (PBR at 0.8 M/SI per year).  Indeed, a related delta, between the 2.69 annual M/SI the agency predicted and the zero annual M/SI the agency nominally authorized, was a subject of this Court's CBD Opinion.  So what gives?

The agency's answer lies in the Conservation Framework.  Under the Framework, the agency "commit[s] to use [its] authorities to implement measures to further reduce . . . M/SI from an annual average of 2.69 . . . to no more than 0.136."  J.A. Vol. 2 at 675 (BiOp 2152). Specifically, NMFS commits to meet three future milestones: annual right-whale M/SI reduced to 2.61 by 2023, 1.04 by 2025, and 0.136 by 2030.  Id. at 677–78 (BiOp 2154–55).  It is only by incorporating the Framework into the proposed agency action that the BiOp authorized, then, that the agency reasoned it could issue a "no-jeopardy" opinion.  Indeed, NMFS emphasized that "the proposed action, including the implementation of the Framework, is not likely to jeopardize the continued existence of North Atlantic right whales."  J.A. Vol. 2 at 540 (BiOp 2017); accord id. at 541 (BiOp 2018) (describing "proposed action that includes implementation of the Framework") (emphases added).  The Court accordingly holds that the Conservation Framework is reviewable as part of the agency action authorized under the BiOp.  It forms a necessary part of the agency's action and may be challenged as such.

    2. *Merits*

Moving to the merits, the Court begins by defining the scope of Plaintiffs' challenge.  As the agency correctly observes, the lobstermen here challenge the Framework as arbitrary only because it aims to reduce M/SI below the PBR, which stands at 0.8 M/SI per year, in the final of the Framework's benchmarks.  See Gov't MSJ at 39 n.7.  In other words, they argue that the long-term 0.136 annual M/SI benchmark that the agency seeks to achieve by 2030 is arbitrary and capricious because NMFS was obligated under the ESA to lower M/SI only to the PBR of 0.8 M/SI and did not explain its decision to go lower.

This challenge is related to, but not decided by, the Court's holding in CBD.  There, the Court concluded that the Framework's short-term targets were invalid under the MMPA, which

26

requires that agencies aim to reduce M/SI from commercial fishing to below the PBR within six

months.  See 16 U.S.C. § 1387(f)(2).  The Court in CBD observed that the agency had authorized

fisheries that it projected for much of the next decade would cause M/SI above the 0.8 PBR rate.

CBD, 2022 WL 2643535, at *14–15 (citing and discussing 16 U.S.C. § 1387(f)(2)).  The Court

thus determined that the agency action in the near term, which was memorialized in its Rule,

violated the MMPA.  Id.  Here, conversely, Plaintiffs challenge the Framework's longer-term

benchmarks, which will be achieved through future rulemakings, and specifically its 0.136

annual M/SI target for 2030.  Plaintiffs argue that this number is arbitrary and capricious — not

because it comes too soon, but because the agency does not explain why it is lower than the

PBR.

 The record and the statutory context provide the answer.  The MMPA identifies the PBR

as the maximum number of whales that all human activity may kill while still allowing that

population to maintain optimum sustainability.  See 16 U.S.C. § 1362(20) ("The term 'potential

biological removal level' means the maximum number of animals, not including natural

mortalities, that may be removed from a marine mammal stock while allowing that stock to reach

or maintain its optimum sustainable population.").  The Framework's targets, by contrast,

identify the maximum number of whales that the agency assessed this particular agency action

— namely, authorizing the lobster and other federal fisheries — may kill without jeopardizing

the whale population.  See, e.g., J.A. 2 at 200, 205 (BiOp 1677, 1682) (assessing whether the

proposed agency action jeopardizes endangered species).  The Framework target falls below the

PBR because the federal fisheries are just one source of harm to the right whale, and thus they

may safely kill fewer than the total number of whale mortality that all human activity causes.

To put a finer point on it, consider what would happen if the agency authorized federal fisheries to kill right whales <u>at</u> the PBR level, as Plaintiffs apparently suggest.  That would mean that for total right-whale M/SI to remain at the PBR, NMFS would necessarily have to assume that M/SI from all other sources is zero — including from fishing and lobstering in state waters, vessel strikes in state and federal waters, and all take in Canadian waters.  The record and common sense show that such a stance would mark the triumph of hope over experience.  Indeed, the lobstermen themselves point to whale deaths in Canada.  <u>See, e.g.</u>, MLU MSJ at 23–25; MALA MSJ at 22–27; ME DMR at 11–16.  The agency thus did not have an obligation to specifically explain why its target for fishery-caused M/SI was below PBR: it seems evident why one source of right-whale M/SI should be lower than the total safe level from all human sources.  NMFS instead independently analyzed the data and used its modeling to set a benchmark specifically for federal fishery M/SI, a benchmark that for self-evident reasons comes in lower than the PBR.

PBR aside, the agency's explanation for the 0.136 M/SI rate, as opposed to some other number, was also not arbitrary and capricious.  Using the peer-reviewed Linden model — which this Court has discussed and held survives arbitrary-and-capricious review — NMFS began with observed adult-female right-whale population numbers as its baseline and then ran 5,000 simulations for each of the various risk-reduction scenarios.  <u>See</u> J.A. Vol. 2 at 526 (BiOp 2003); <u>see also</u> <u>id.</u> at 526–41 (BiOp 2003–18) (explaining methodology and findings in greater detail).  Only where federal-fishery M/SI fell by at least 95%, to 0.136 per year, did the fisheries not cause statistically significant harm to the right-whale population trajectory.  <u>See</u> J.A. Vol. 2 at 675 (BiOp 2152) (Conservation Framework summarizing results).  Of note, the agency emphasizes that its benchmarks are flexible and that it will continue to assess the best data and

refine its targets, including in a major reassessment in 2025–26.  See J.A. Vol. 2 at 676–77

(BiOp 2153–54).  As the science now stands, however, the Court cannot say that NMFS's

analysis and projections were arbitrary and capricious.

This is particularly so because the MMPA requires that the agency aim in the long term

to reduce annual M/SI to zero.  16 U.S.C. § 1387(f)(2); see also CBD, 2022 WL 2643535, at

*14–15.  Plaintiffs are correct that the agency did not cite its MMPA obligations in its analysis

on this point, but the Court observes that operative legal constraint only to further emphasize the

appropriateness of the agency's target.

To be sure, NMFS could have articulated more clearly the interplay between the 0.8 M/SI

PBR and its target 0.136 M/SI.  But the agency was not required to explain why it did not

allocate all allowable M/SI to the federal fisheries; the record is replete with examples of other

human activity causing M/SI.  Because the agency sufficiently explained how it arrived at its

0.136 M/SI annual target, the Court will not disturb that number.

MELA also briefly contends that the Framework is not lawfully part of the BiOp.  See

MELA MSJ at 41–43.  This is not a reviewability point similar to what the Court analyzed

above; instead, MELA argues that the Framework should not have been included at all.  Plaintiff

maintains that the agency had only two options for proposing the Framework through the BiOp:

either as part of the "reasonable and prudent alternatives" following a jeopardy BiOp, which

would broadly alter the agency action, or as part of the "reasonable and prudent measures"

following a no-jeopardy BiOp, which must "involve only minor changes" to the action and

"cannot alter [its] basic design."  MELA MSJ at 41–42 (first citing 16 U.S.C.

§ 1536(b)(4)(C)(ii), and then citing 50 C.F.R. § 402.14(i)(2)).  Yet, MELA argues, the

Framework is neither: it cannot be a reasonable alternative because it did not follow a jeopardy

BiOp, and it cannot be a reasonable measure because it involves more than minor changes to the action.  See MELA MSJ at 41, Gov't MSJ at 41 n.8.  Plaintiff accordingly contends that the Framework is an unlawful end run around the two statutory options NMFS had available to propose changes in a BiOp.

While this argument has some superficial appeal, it ultimately founders.  The reason why lies in the different roles the "action" and "consulting" agencies play in the ESA process.  Recall that different divisions of NMFS served as action and consulting agencies for this proposed agency action.  See CBD, 2022 WL 2643535, at *3; see also J.A. Vol. 2 at 200 (BiOp 1677).  MELA's two proposed roles for the Framework — as reasonable alternative or reasonable measure — are ones that a consulting agency may incorporate in its BiOp.  But here, NMFS as action agency included the Framework within the scope of the proposed action it submitted to the consulting agency.  That is to say, NMFS's action agency proposed one single (multi-part) action: to authorize the federal fisheries and implement the Framework.  See J.A. Vol. 2 at 540 (BiOp 2017) (defining "the proposed action [as] including the implementation of the Framework"); accord id. at 541 (BiOp 2018) (describing "proposed action that includes implementation of the Framework").  While MELA identifies limits on a consulting agency's proposed "reasonable and prudent measures," MELA MSJ at 41–42 (citing 50 C.F.R. § 402.14(i)(2)), it never identifies any statute, regulation, or other legal rule limiting how an action agency may define the scope of its proposed action.

The Framework is thus both lawfully part of the BiOp and not arbitrary or capricious.

D.  Count III: The Final Rule

Last up, the lobstermen challenge the Final Rule as arbitrarily relying on the flawed BiOp.  While properly pled, this position cannot save the day for them.

1.  *Properly Pled*

As a threshold matter, the conservation groups argue that this cause of action is invalid because Plaintiffs can bring such claims only through the ESA's citizen-suit provision and have failed to follow that provision's processes.  See CBD MSJ at 27-31.  The Court is not convinced.

It is clear that plaintiffs may challenge an action agency's reliance on a biological opinion under the APA.  Our Circuit has held as much.  In City of Tacoma v. FERC, 460 F.3d 53 (D.C. Cir. 2006), it heard and analyzed under the APA a challenge that an agency had improperly relied on a BiOp, not requiring the plaintiff to instead bring that claim as a citizen suit.  Id. at 74–78.  That analysis is dispositive here.  It is also not surprising, as the Supreme Court has held that ordinary APA review is available for claims that do not allege direct violations of the ESA and that are accordingly not channeled into its judicial-review provision.  Bennett v. Spear, 520 U.S. 154, 175 (1997).

Plaintiffs in this case challenge the agency's reliance on a particular BiOp as arbitrary and capricious, just as the plaintiffs in City of Tacoma did.  They do not allege a direct violation of the ESA, such as a failure to list an endangered species or to consult with a consulting agency, which would require bringing a citizen suit.  Here, as there, ordinary APA review thus remains available.

2.  *Merits*

The merits are nonetheless a quick trip back to port.  Plaintiffs charge only that "[b]ecause the 2021 BiOp is arbitrary and unlawful[,] . . . NMFS's reliance on the 2021 BiOp for its issuance of the TRP Rule violates ESA Section 7 and is arbitrary [and] capricious" under the APA.  See MELA Compl., ¶ 109; MLU Compl., ¶ 95; ME DMR Compl., ¶ 86.  In other words, the lobstermen's only argument against the Rule is that it relies on an invalid BiOp.  But this

Court has just held that the BiOp survives Plaintiffs' challenges in this case.  The Rule's reliance

on the BiOp is thus *a fortiori* lawful.  See City of Tacoma, 460 F.3d at 75.

In its Motion for Summary Judgment, MLU floats other challenges to the Final Rule: that

it conflicts with the MMPA's purposes, that it fails to implement restrictions on gillnets, and that

the take-reduction team that crafted it unlawfully excluded MLU, among others.  As previewed

above, these challenges do not appear in MLU's Complaint, and so the Court will not consider

them.  See MLU Compl., ¶¶ 93–95 (charging only that "[w]hen issuing the TRP Rule, NMFS

relied upon the 2021 BiOp," and that "[b]ecause the 2021 BiOp is arbitrary and unlawful for all

of the reasons set forth in this Complaint, NMFS's reliance on the 2021 BiOp for its issuance of

the TRP Rule violates ESA Section 7 and is arbitrary [and] capricious" under the APA); see also

MELA Compl., ¶¶ 107–09; ME DMR Compl., ¶¶ 84–86 (identical).

*    *    *

As Plaintiffs have not shown that the challenged agency actions were arbitrary and

capricious, the Court will grant summary judgment to Defendants.  It will do so with respect to

all Plaintiffs, including the Massachusetts Lobstermen's Association, which pled a more

threadbare version of the same Complaint and thus fails to state a claim for the same reasons.

See ECF No. 31 (MALA Complaint).  Summary judgment will cover all of Plaintiffs' claims,

including the count MELA abandoned at this stage.  See Ass'n for Cmty. Affiliated Plans v.

Dep't of Treas., 392 F. Supp. 3d 22, 29 n.3 (D.D.C. 2009) (citing Aliotta v. Bair, 614 F.3d 556,

562–63 (D.C. Cir. 2010)).

The Court remains cognizant of the weighty interests of all parties to this dispute: the

lobstermen in preserving their livelihood and traditions; the conservation groups in protecting the

near-extinct right whale; and NMFS in making complex predictions with imperfect data.  The

32

State of Maine, too, has a long history with fishing and lobstering.  See, e.g., Colin Woodard,

The Lobster Coast (2004) (describing history of American settlers on the Maine coast and the

development of the state's fishing and lobster industries).  As the science improves and the

climate shifts, new data and new literature appear to be developing every day.  See ALWTRT

Informational Webinar: Phase 1 Risk Reduction Update, https://bit.ly/3TztJ2Y

[https://perma.cc/PXQ9-22H5] (Aug. 18, 2022) (agency take-reduction team analyzing latest

data); see also generally, e.g., Willse, Summers, & Chen, Vertical Line Requirements and North

Atlantic Right Whale Entanglement Risk Reduction for the Gulf of Maine American Lobster

Fishery (Apr. 2022); Meyer-Gutbrod, Greene, Davies, & Johns, Ocean Regime Shift is Driving

Collapse of the North Atlantic Right Whale Population (Aug. 2021) (examples of new literature).

        While this case has reached its terminus, the Court fully expects that NMFS will continue

diligently incorporating the latest information, considering the concerns of all stakeholders, and

adapting to changing circumstances in making its future decisions.

## IV.    Conclusion

        The Court, accordingly, will deny MLU, MELA, and ME DMR's Motions for Summary

Judgment, and it will grant CBD and NMFS's Cross-Motions for Summary Judgment.  An Order

so stating will issue this day.


                                                    /s/ James E. Boasberg
                                                    JAMES E. BOASBERG
                                                    United States District Judge

Date:  September 8, 2022