**No. 22-5238(L), 22-5244, 22-5245, 22-5246**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

MAINE LOBSTERMEN'S ASSOCIATION,
*Plaintiff-Appellant*,

STATE OF MAINE DEPARTMENT OF MARINE RESOURCES
*Intervenor-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY OF COMMERCE; JANET COIT, IN HER OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR FOR FISHERIES,
*Defendants-Appellees*,

CONSERVATION LAW FOUNDATION; CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE,
*Intervenors-Appellees.*

―――――――――――

On Appeal from the United States District Court for the District of Columbia,
No. 1:21-cv-02509-JEB

―――――――――――

## BRIEF FOR INTERVENOR-PLAINTIFF-APPELLANT STATE OF MAINE DEPARTMENT OF MARINE RESOURCES

―――――――――――

Paul S. Weiland (D.C. Cir. No. 56111),
pweiland@nossaman.com
Brian Ferrasci-O'Malley, (D.D.C. No. WA0024),
bferrasciomalley@nossaman.com
NOSSAMAN LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

*Attorneys for Intervenor-Plaintiff-Appellant*
*STATE OF MAINE DEPARTMENT OF MARINE RESOURCES*

November 9, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici.

Plaintiff-Appellant in this case is the Maine Lobstermen's Association.  The

State of Maine's Department of Marine Resources, the Massachusetts

Lobstermen's Association, and the District 4 Lodge of the International

Association of Machinists and Aerospace Workers, Local Lodge 207 intervened as

plaintiffs in the district court and are also Appellants in this appeal.  The

Defendants-Appellees in this case are the National Marine Fisheries Service, Gina

Raimondo (in her official capacity as Secretary of Commerce), and Janet Coit (in

her official capacity as Assistant Administrator for Fisheries) (collectively,

"NMFS").  The Conservation Law Foundation, the Center for Biological Diversity,

and the Defenders of Wildlife intervened on behalf of NMFS in the district court

and are also Appellees in this appeal.  No other parties, intervenors, or amici

appeared before the district court.  The State of New Hampshire has filed a

statement of intent to file an amicus brief in support of Appellants in this Court; no

additional intervenors or amici have appeared before this Court.

### B.    Ruling Under Review.

The ruling under review is the district court order and accompanying

memorandum opinion granting Appellees' cross-motions for summary judgment

and denying Appellants' motions for summary judgment.  Judge James E.

Boasberg of the U.S. District Court for the District of Columbia issued both the order and the memorandum on September 8, 2022. The order is entry 75 on the district court docket. The opinion is entry 76 on the district court docket. The Westlaw citation for the opinion is 2022 WL 4392642.

### C.    Related Cases.

This case has not previously come before this Court, nor has it come before any other court (other than the district court). The U.S. District Court for the District of Columbia is currently considering *Center for Biological Diversity v. Raimondo*, No. 18-cv-112, a case that involves substantially the same parties and a challenge to the same biological opinion issued by NMFS. Counsel is not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

Page:

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS .................................................... v

I.     STATEMENT OF JURISDICTION ....................................... 1

II.    STATUTES AND REGULATIONS ........................................ 1

III.   STATEMENT OF THE ISSUES PRESENTED ..................... 1

IV.    STATEMENT OF THE CASE ................................................ 1

       A.    Consultation Under the ESA ........................................ 2

       B.    The Biological Opinion ................................................. 4

V.     SUMMARY OF ARGUMENT ................................................ 5

VI.    ARGUMENT .......................................................................... 6

       A.    Standard of Review ....................................................... 6

       B.    The Worst Case Scenario Analytical Approach is
             Unlawful ........................................................................ 8

             1.    NMFS acted unlawfully by disregarding available
                   data on apportionment of entanglements between
                   the U.S. and Canada. ........................................ 12

                   a)    NMFS ignored the facts and did not
                         provide a rational reason why. ................ 12

                   b)    Multiple peer reviewers did not agree with
                         NMFS's approach. .................................. 14

                   c)    Other interested parties pointed out this
                         error to NMFS. ........................................ 16

             2.    NMFS erred by attributing 100 percent of U.S.
                   right whale entanglements to the lobster fishery. ............. 17

3.    NMFS erred by disregarding the data on natural mortality of right whales. ....................................................22

VII.    CONCLUSION .........................................................................25

CERTIFICATE OF COMPLIANCE ...................................................27

CERTIFICATE OF SERVICE ............................................................28

ADDENDUM ....................................................................................29

61054187

# TABLE OF AUTHORITIES

Page(s):

## Federal Cases

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998)................................................................16

*American Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017)............................................6, 7

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................6, 11, 13

*Defenders Of Wildlife v. U.S. Dep't. of the Interior*,
  931 F.3d 339 (4th Cir. 2019) ...................................................7

*Ethyl Corp. v. EPA*,
  541 F.2d 1 (D.C. Cir. 1976)......................................................7

*Kern Cty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) .................................................8

*Michigan v. EPA*,
  576 U.S. 743 (2015)................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................7, 14, 15, 22, 24, 25

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)..................................................................7

*Southwest Ctr. For Biological Diversity v. Babbitt*,
  215 F.3d 58 (D.C. Cir. 2000) ...................................................8

## Federal Statutes

5 U.S.C. § 706(2)(A)....................................................................6, 7

16 U.S.C. § 1533(a) .........................................................................2

16 U.S.C. § 1533(b) .........................................................................2

16 U.S.C. § 1536(a)(2)................................................3, 7, 8, 11, 13, 22

61054187

16 U.S.C. § 1536(b)(3)(A)....................................................................3

**Regulations**

50 C.F.R. pt. 402....................................................................3

50 C.F.R. § 402.02....................................................................3, 8

50 C.F.R. § 402.14....................................................................3

50 C.F.R. § 402.14(d)....................................................................3

50 C.F.R. § 402.14(g)(4)....................................................................3

50 C.F.R. § 402.14(g)(8)....................................................................3

61054187

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | References to the administrative record for the 2021 Biological Opinion |
| Conservation Framework | North Atlantic Right Whale Conservation Framework |
| ESA | Endangered Species Act |
| J.A. | References to the joint appendix |
| M/SI | mortalities and serious injuries |
| NMFS | National Marine Fisheries Service |
| right whale | North Atlantic right whale |

61054187

I.    **STATEMENT OF JURISDICTION**

Maine adopts by reference the Statement of Jurisdiction of the Maine

Lobstermen's Association.

II.   **STATUTES AND REGULATIONS**

Relevant statutory and regulatory provisions are set forth in the addendum to

this brief.

III.  **STATEMENT OF THE ISSUES PRESENTED**

Whether the National Marine Fisheries Service ("NMFS") Biological

Opinion violated the Administrative Procedure Act ("APA") and Endangered

Species Act ("ESA") when it disregarded available information regarding the

effects of the lobster fishery on the right whale population.

Whether NMFS violated the APA and ESA when it used the "worst case

scenario" in its Biological Opinion in those instances where the agency determined

there was uncertainty regarding the status and trend of the right whale population

or the effects of the lobster fishery on that population.

IV.   **STATEMENT OF THE CASE**

The legal issue presented in this appeal is whether NMFS complied with the

APA and ESA when it developed its 2021 Biological Opinion for 10 fisheries

along the Eastern Seaboard of the United States, including the American lobster

fishery ("Biological Opinion").  The practical issue is whether it is appropriate for

the agency – when analyzing the effects of the lobster fishery on the North Atlantic

right whale ("right whale") – to embrace an approach that systematically inflates the fishery's effects on the right whale in a manner that will inevitably lead to the destruction of the fishery, leaving a gaping hole in Maine's economy and devastating many coastal communities.  The district court held that "NMFS suitably considered the data available at the time of its action and reasonably explained its scientific conclusions."  A220.  But in its hurried opinion deferring to NMFS, the court failed to give due consideration to the facts established by the agency's own Biological Opinion and administrative record.  These facts demonstrate a failure to "use the best scientific and commercial data available" when preparing the Biological Opinion.

### A.    Consultation Under the ESA

The Secretaries of Commerce and the Interior jointly administer the ESA. The Secretary of Commerce has delegated this authority to NMFS, and the Secretary of the Interior has delegated it to the U.S. Fish and Wildlife Service. Species are listed as either "endangered" or "threatened" pursuant to statutory criteria and rulemaking procedures set forth in the ESA.  16 U.S.C. § 1533(a)-(b). Once a species is listed, the ESA provides it with a number of protections.

Section 7(a)(2) of the ESA requires a federal action agency, in consultation with and with the assistance of the relevant federal wildlife agency (in this case, NMFS), to ensure that any action authorized, funded, or carried out by such action agency is not likely to jeopardize the continued existence of any listed species or

2

result in the destruction or adverse modification of critical habitat of such species. *Id.* § 1536(a)(2). Section 7, the Joint Consultation Regulations, 50 C.F.R. pt. 402, and the *Endangered Species Consultation Handbook* set out a detailed process for analyzing the effects of a proposed federal action on listed species and designated critical habitat.

The federal action agency must first determine whether a proposed action "may affect" a listed species. 50 C.F.R. § 402.14. Where, as here, the proposed action may affect a listed species, the action agency must consult with the appropriate federal wildlife agency. In this instance, NMFS was both (i) the federal action agency, since it was proposing to authorize the fisheries in federal waters and to promulgate regulations to implement amendments to the Atlantic Large Whale Take Reduction Plan, and (ii) the consulting agency. As part of the consultation process, in its capacity as consulting agency, NMFS must issue a biological opinion detailing the effects of the action on the listed species. 16 U.S.C. § 1536(b)(3)(A). The Joint Consultation Regulations define "effects of the action" and "environmental baseline," 50 C.F.R. § 402.02, and explain that NMFS must add the effects of the action and cumulative effects to the environmental baseline in formulating its biological opinion. *Id.* § 402.14(g)(4). In fulfilling the consultation requirements, each federal agency is required to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

61054187

**B.     The Biological Opinion**

In May 2021, NMFS released the Biological Opinion that is the subject of this litigation.  The proposed action that was the subject of consultation resulting in the Biological Opinion consisted of: (i) authorization of 10 fisheries along the Eastern Seaboard of the United States, including the American lobster fishery; (ii) the North Atlantic Right Whale Conservation Framework ("Conservation Framework"); and (iii) management measures implemented in multiple New England Fishery Management Council Fishery Management Plans.  A604-11. NMFS released a draft of the Biological Opinion in January of the same year, providing interested parties with the opportunity to review and comment.[1]  A449.

NMFS further explained in the Conservation Framework, attached to the Biological Opinion, that during consultation the agency "identified the need to implement measures to further reduce entanglement of North Atlantic right whales . . . to meet the mandates of the ESA," and that the Conservation Framework "identifies the level of reductions in mortalities and serious injuries (M/SI) that NMFS is committed to achieve in order to meet its ESA mandates."  A1071.  The Framework commitments are, NMFS explained, "needed to ensure the fisheries will not appreciably reduce the likelihood of the survival and recovery of the species as required by the ESA."  A1074.

---

[1] The State of Maine provided detailed input on the draft Biological Opinion. A1220-30.

Based on its analysis of the proposed action, including the Conservation
Framework, NMFS indicated it expects "the status and trend of the population of
right whales would decline during the first 10 years and with the implementation of
the Framework, continue to decline but at a rate comparable to the no federal
fisheries scenario." A938. NMFS went on to state that its projections "show that
the probability of the species continuing to decline, with or without the proposed
action, is extremely high (98.8 percent and 97.72 percent) respectively." *Id*. At
the same time, NMFS noted the projections "were generated utilizing worst case
assumptions for several key variables," and acknowledged they "should not be
interpreted as an accurate predictor of the actual future right whale population."
A939.

## V.    SUMMARY OF ARGUMENT

Section 7(a)(2) of the Endangered Species Act requires NMFS to analyze the
effects of federal agency actions on species listed as threatened or endangered and
the designated critical habitat of such species. Further, it explicitly states NMFS
"shall use the best scientific and commercial data available" when analyzing the
effects of the action. Here, in analyzing the effects of the lobster fishery on the
right whale, NMFS adopted a "worst case scenario" analytical approach. The
agency's use of this approach was pervasive. At each step in the analytical
process, it led NMFS to make decisions that – in the agency's own words – would
"overestimate" the likelihood of right whale population decline, were "pessimistic"

61054187

regarding the benefits of measures intended to protect the right whale, and resulted in "a more conservative estimate" of entanglements in gear than the data supported.

The "worst case scenario" approach led NMFS to reject available data that could and should inform the agency's analysis of the effects of the action.  In each instance, the decision to disregard the best available scientific information led the agency to inflate the effects of the lobster fishery on the right whale.  NMFS characterized this systematic exaggeration of the impacts of the fishery on the right whale as precautionary.  But arbitrary decision-making is not in the long-term interests of the right whale, the lobster fishery, or Maine's coastal communities fueled by that fishery.  It is for this very reason that Congress included the requirement to use the best scientific and commercial data available in the Endangered Species Act.  *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

## VI.    ARGUMENT

### A.    Standard of Review

On review of a district court's grant of summary judgement, a circuit court reviews the decision *de novo*.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 922 (D.C. Cir. 2017).  The APA provides for judicial review of final agency actions including biological opinions.  *See* 5 U.S.C. § 706(2)(A); *Bennett v. Spear*, 520 U.S. at 154-55.  Per the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary,

6

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).  While deferential to the agency, the court's deference must

not be mistaken for rubber stamp approval.  *Ethyl Corp. v. EPA*, 541 F.2d 1, 34-35

(D.C. Cir. 1976).  The reviewing court "must understand enough about the

problem confronting the agency to comprehend the meaning of the evidence relied

upon and the evidence discarded; the questions addressed by the agency and those

bypassed; the choices open to the agency and those made." *Id*. at 36.

In its searching inquiry, the court cannot make up for the agency's own

deficiencies and "may not supply a reasoned basis for the agency's action that the

agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947)).  The agency must be able to "articulate a reasoned explanation for its

decision," including a rational connection between the facts found and its ultimate

choice. *Am. Wild Horse Pres.*, 873 F.3d at 923.  If the court determines that an

agency "entirely failed to consider an important aspect of the problem" or "offered

an explanation for its decision that runs counter to the evidence before the agency,"

then the action is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

In addition, under section 7(a)(2) of the ESA, each federal agency is

required to "use the best scientific and commercial data available." 16 U.S.C.

§ 1536(a)(2).  An agency's failure to use the best available science is a violation of

the APA. *Defs. Of Wildlife v. U.S. Dep't. of the Interior*, 931 F.3d 339, 345 (4th

Cir. 2019).  This best available data requirement prevents an agency from ignoring

other available data and "prohibits an agency from disregarding available scientific

evidence that is in some way better than the evidence it relies on."  *Kern Cty. Farm*

*Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (quoting *Sw. Ctr. For*

*Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)) (alterations

omitted).

### B.     The Worst Case Scenario Analytical Approach is Unlawful

NMFS violated the APA and ESA when – rather than using the best

scientific information available – it adopted a pervasive "worst case scenario"

approach to analyzing the effects of the lobster fishery on the right whale.  In the

Biological Opinion, NMFS explained the approach to analyzing the effects of the

action on the right whale prescribed by the ESA and its regulations as follows:

> In *Effects of the Action* section, we present the results of our assessment
> of the probable effects of [the lobster fishery on the right whale].
> Effects of the action are defined as all consequences to listed species or
> critical habitat that are caused by the proposed action, including the
> consequences of other activities that are caused by the proposed action.
> A consequence is caused by the proposed action if it would not occur
> but for the proposed action, and it is reasonably certain to occur.

A804.  This approach is consistent with the ESA consultation provisions –

including the requirement to "use the best scientific and commercial data

available" – and the agency's consultation regulations.  16 U.S.C. § 1536(a)(2); 50

C.F.R. § 402.02 (defining the "effects of the action").

However, rather than follow this approach and adhere to the requirements

set forth in the ESA and its implementing regulations, NMFS elected to adopt a "worst case scenario" approach to analyzing the effects of the lobster fishery on the right whale.[2]  The administrative record is replete with evidence of this fact.  For example, in the section of the Biological Opinion describing the effects of the lobster fishery on the right whale, NMFS stated: "When dealing with data uncertainties (e.g, a range of potential calving rates, or unquantified benefits from conservation measures), we utilized metrics representing the <u>worst case scenario</u>. Consequently, model outputs very likely overestimate the likelihood of a declining population."  A926 (emphasis added).  In other words, NMFS purposely manipulated its population model to yield outcomes that underestimated the size and future trajectory of the right whale population and underestimated the benefits of right whale conservation measures.

Likewise, in a memo prepared by NMFS "for the record" with respect to the Biological Opinion, the agency reiterated the consequences of its "worst case scenario" approach: "we believe that the [right whale population] projections likely underestimate the population's ability to recover and the trajectory is likely

---

[2] NMFS also referred to its "worst case scenario" approach as "precautionary." *E.g.*, A454 (NMFS PowerPoint presentation in which the agency describes its approach to the consultation as "Precautionary measures everywhere"); A458 (same).  An approach that improperly allocates the risk posed to a listed species by various anthropogenic and non-anthropogenic factors is not precautionary; it is misleading and can be expected to result in faulty public policy.

9

pessimistic." A497. In addition to underestimating the size and future trajectory of the right whale population and underestimating the benefits of conservation measures intended to benefit that population, NMFS systematically overstated the effects of the lobster fishery on the population. Examples of the ways in which the agency overstated the effects of the lobster fishery on the right whale population, which we will describe in some detail below, were:

1. disregarding the best available data on apportionment of entanglements between the Canada and the United States and defaulting instead to an arbitrary 50/50 split;

2. disregarding the best available data regarding the apportionment of right whale entanglement between gear types and assuming instead that 100 percent of entanglements are attributable to lobster trap/pot gear; and

3. disregarding the best available data regarding the apportionment of right whale mortality between anthropogenic and natural sources and assuming instead that 100 percent of mortality is attributable to anthropogenic sources.

NMFS applied its "worst case scenario" analytical approach throughout the process of analyzing the effects of the lobster fishery on the right whale. By utilizing this "worst case scenario" approach, NMFS sealed the fate of the lobster fishery – assuring that the agency's analysis would demonstrate that the right whale was on the brink of extinction and the lobster fishery was to blame,

10

irrespective of the best available scientific information.  This is precisely the type of needless economic dislocation that Congress sought to avoid when it incorporated the mandate to "use the best scientific and commercial data available" into the consultation requirement in section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2); *Bennett v. Spear*, 520 U.S. at 176 (holding that the purpose of the best available science requirement is to "ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise" in order to advance the statute's twin objectives of species preservation and avoiding needless economic dislocation).

In rejecting this argument that NMFS erred by utilizing a "worst case scenario" approach, the district court opined that "the agency did not use a substantive presumption to displace scientific judgment . . . ."  A221.  However, the record demonstrates that this is precisely what NMFS did.  For example, NMFS states repeatedly that, in its best professional judgment, measures taken by the Government of Canada benefit right whales.  A518 ("we believe that measures taken by the Government of Canada are benefiting right whales"); A1075 ("we assert that the measures taken by Canada are and will continue to benefit right whales"); A2125 ("we believe that the measures taken by Canada will benefit right whales").  But, in light of its "worst case scenario approach," NMFS chose to displace its best professional judgment in the Biological Opinion.  A518 (stating "we assume there is no positive impact from Canadian measures"); A1075

11

(explaining that the agency's analysis would proceed "as if the Canadian measures are not benefitting the right whale population"); A2125 (stating the agency "takes a conservative approach and plans as if the Canadian measures are not benefitting right whales").  The agency's decision to disregard the best available scientific information violated the APA and ESA.

> 1.  **NMFS acted unlawfully by disregarding available data on apportionment of entanglements between the U.S. and Canada.**

One area where the worst case scenario approach led NMFS to disregard best available scientific information in the Biological Opinion was in apportioning entanglements of unknown origin 50-50 between the United States and Canada.  In arriving at this arbitrary 50-50 split, NMFS discarded actual scientific data it had on entanglements of known origin.  Contrary to the claim made by NMFS in the Biological Opinion and embraced by the district court, the independent peer review conducted by the Center for Independent Experts did <u>not</u> conclude that NMFS's 50-50 approach was "reasonable."  In fact, multiple peer reviewers at various points along the process encouraged the agency to reassess how it was apportioning mortalities of unknown origin, with one expressly suggesting the agency base its allocation on actual data.

> a)  *NMFS ignored the facts and did not provide a rational reason why.*

The ESA requires agencies to "use the best scientific and commercial data

12

available." 16 U.S.C. § 1536(a)(2).  This requirement exists "to ensure that the

ESA not be implemented haphazardly, on the basis of speculation or surmise."

*Bennett v. Spear*, 520 U.S. at 176.  Yet in the Biological Opinion, NMFS chose to

set aside the hard scientific data the agency possessed.  As NMFS laid out in the

draft Biological Opinion, it could determine the country of origin for a substantial

number of the observed entanglements for the covered period (e.g., 26 of the 112

observations from 2010-2019, or more than 23 percent).  A450-51.  Of those

observed entanglements, 49 resulted in M/SI, 11 of which could be assigned to a

country of origin (more than 22 percent).  *Id.*  NMFS's own data showed that the

Canada-U.S. split was heavily weighted toward impacts in Canadian waters: 69

percent of all known entanglements and 82 percent of known entanglements that

resulted in mortality or significant injury.  *Id.*  The agency could have apportioned

unassigned observed entanglements based on those observed data, yet the agency

chose to use an arbitrary 50-50 split.[3]  *See* A814-15.

Clearly, NMFS needed to come up with a way to apportion entanglements of

unknown origin, but instead of providing a well-reasoned, logical approach based

on the existing data, the agency chose to make an arbitrary assumption that

conflicted with the existing data.  Worse, the agency provided no "rational

---

[3] Using a subset of data to extrapolate to the full data set is standard practice in
conservation biology and fisheries science and consistent with the agency's own
conduct as we explain in section VI.B.2, *infra*.

connection between the facts found and the choice made." *State Farm*, 463 U.S. at

43. In the section of the Biological Opinion where NMFS arrives at the 50-50

split, the only data that the agency presents are the aforementioned data on

observed entanglements, which show substantially greater impacts attributable to

Canada. *See* A813-15. The only information offered to explain or support the 50-

50 split are summary statements for which NMFS offers no factual support. *See*

*id.* There is no "rational connection" provided; no explanation to justify ignoring

the actual data and no support for NMFS's blanket assertions about other factors.

> **b)** *Multiple peer reviewers did not agree with NMFS's approach.*

In affirming the agency's decision to set aside the available data and opt to

split the difference, the district court lauds NMFS for submitting its approach for

peer review. A224 ("For good measure, the agency submitted its approach for peer

review by the Center for Independent Experts . . ."). But peer review is only an

effective means to improve agency decision-making if the agency responds

appropriately to reviewer input. In this circumstance, NMFS failed to do so and

went further to mischaracterize the independent peer review as supporting the

agency's methods. In the Biological Opinion, NMFS asserts that the peer

reviewers "considered the approach reasonable" and broadly refers to the peer

review reports in a footnote with no precise citation to where the reviewers came to

this conclusion. *See* A815. Unfortunately, the district court took NMFS's

statement at face value and does not appear to have verified the agency's

assertions. A224. If it had, the court would have seen that multiple peer reviewers recommended NMFS revisit its decision.

The district court cited to one of the peer review summary reports of the North Atlantic Right Whale Decision Support Tool to support the court's conclusion that peer reviewers found NMFS's approach "reasonable." *See id.* (citing A1991-92). However, that summary of multiple peer reviews expressly states twice that "a different method from the 50:50 split of unknowns to US and Canadian fisheries should be examined" and the word "reasonable" merely appears in an unrelated quote referring to how to determine the potential biological removal in a migratory stock. *See* A1991. When it comes to the 50-50 apportionment, the summary lists the following "concern":

> The current approach for apportioning human-caused mortality by country may not be the most appropriate approach. There has been a clear recent shift in the spatial distribution of NARW which has been coupled with a shift in the source of known serious injuries or mortalities to more Canadian records. Therefore, a different method from the 50:50 split of unknowns to US and Canadian fisheries should be examined.

*Id.*

Likewise, one of the peer reviewers of the North Atlantic Right Whale Model Projections stated that "[t]he split of mortalities 1:1 between USA and Canada does not seem to have much supporting evidence in the documentation provided." A422. Another peer reviewer concluded that the 50-50 apportionment "does not reflect the current shift in NARW distribution and the recent increase in

15

Canadian fisheries involvement in SI-M" and expressly suggested the agency base

apportionment on known data. A2023.

### c)    Other interested parties pointed out this error to NMFS.

It was not just the peer reviewers who told NMFS that its arbitrary 50-50

allocation was inconsistent with the requirement to use the best available scientific

information. In comments on the draft Biological Opinion, the State of Maine

advocated for reliance on "actual data" in the record to apportion mortality of right

whales between Canada and the United States where the country responsible could

not be determined. A1224. A coalition of associations representing the New

England lobster fishery likewise observed "NMFS's 50-50 allocation

determination is not consistent with the best available scientific data, including

NMFS's own data." A1177.

NMFS chose to ignore all of these points. The agency's decision to

apportion entanglements of unknown origin 50-50 between the United States and

Canada blatantly ignored a decade of existing actual data in favor of opinions that

are unsupported in the Biological Opinion. NMFS did not use "the best scientific

and commercial data available" – it ignored those data. This is the antithesis of

reasoned decision-making, the bare minimum required under the APA. *Michigan*

*v. EPA*, 576 U.S. 743, 750 (2015) (opining that the APA requires federal agencies

to engage in reasoned decision-making); *Allentown Mack Sales & Serv., Inc. v.*

*NLRB*, 522 U.S. 359, 374 (1998) (same).

61054187

### 2.    NMFS erred by attributing 100 percent of U.S. right whale entanglements to the lobster fishery.

Right whales can become entangled in trap/pot gear used by lobster harvesters or in gillnet fishing gear used in other fisheries, such as the spiny dogfish fishery.  NMFS has gathered data, reported in the Biological Opinion, on the number of entanglements by gear type.  A816 (Table 59).  For approximately one quarter of the reported data, the gear type is known and falls within one of three categories: trap/pot, gillnet, or net.  For the other three quarters of reported data, the gear type is categorized as not known.  In Chart 1, we



summarize the combined known and unknown data (combining gillnet and net gear into a single category) from Table 59 in the Biological Opinion.  In Chart 2, we summarize the known data only, again combining gillnet and net gear into a single category and also from Table 59 in the Biological Opinion.

17



Chart 2: Known M/SI Entanglements by Gear Type: 2010-2018

Rather than rely on the known data when determining how to apportion the proportion of right whale entanglements resulting in mortality or serious injury by gear type, NMFS simply assumed that 100 percent of unknown entanglements are attributable to trap/pot gear (i.e., lobster gear).  A482 ("As described in the draft and final Biological Opinion, we assign all confirmed M/SI entanglements with unknown gear to pot/trap gear.").  By doing so, NMFS overstated the effects of the lobster fishery on the right whale, violating the APA and ESA.

NMFS's decision to disregard the available data when determining how to apportion mortality and significant injury between gear types is inconsistent with standard practice in conservation biology and fisheries science.[4]  It is also

---

[4] This practice is not limited to conservation biology; rather it is reflected in myriad science-informed activities from the design of clinical trials to test new vaccines to the use of polling data to predict election outcomes.

61054187

inconsistent with the agency's own conduct elsewhere in the Biological Opinion of extrapolating (or drawing inference) from a subset to an entire data set. For example, in the Biological Opinion NMFS extrapolates from a subset of data (the observed data) to estimate both the abundance and distribution of right whales. A680 (describing NMFS-generated abundance estimates for right whales using methods set forth in Pace et al. (2017)); A1804 (explaining that observed data forms the basis of an annual assessment of right whale population status); A784 (describing the distribution of right whales based on surveys and monitoring data). There are many other examples from the Biological Opinion where NMFS extrapolates from a subset of data to the entire data set, for example, of fin whale populations based on survey data (A689), sea turtle density using satellite tags (A788), and Atlantic salmon distribution using trawl surveys (A792).

In deciding to disregard the best available data and assume that 100 percent of entanglements resulting in mortality or significant injury should be attributed to trap/pot gear, NMFS leaned on four arguments, all of which the district court wrongly found persuasive. The first of these is that right whale interactions with nets "may be more easily detected" resulting in a higher percentage of these interactions being observed. A226. This supposition is not unreasonable on its face – nets may (or may not) be more easily detected than lines – but a supposition does not provide a reasonable basis to disregard the best available data. And NMFS cites to no research whatsoever regarding the relative detection rates of net

19

gear and trap/pot gear to support the supposition.

Second, the court found persuasive the agency's argument "that the percentage of known trap/pot interactions that cause M/SI (53%) is substantially higher than the percentage of known gillnet interactions that cause M/SI (29%)." *Id.* But this argument is based on the very data reported in Table 59 that NMFS disregards when it elects not to extrapolate from the observed data. Below, we reproduce that table with an additional row that includes the percentages quoted by the district court.

Table 1. Number of entanglements and M/SI by gear type, 2010-2018

|  | Unknown | Gillnet | Net | Pot/Trap | Total |
|---|---|---|---|---|---|
| Entanglements | 82 | 6 | 2 | 17 | 107 |
| M/SI | 37 | 1.75 | 0.75 | 9 | 48.5 |
| M/SI entanglements as a percent of total entanglements | 45% | 29% | 38% | 53% | 45% |

These data do suggest that pot/trap accounts for the highest number of known entanglements, the highest number of known entanglements resulting in M/SI, and the highest percentage of known entanglements resulting in M/SI by gear type. But they provide no support for the argument that the other data can simply be zeroed out.

Third, the court opined that "NMFS explained that vertical lines are the principal cause of M/SI injury: 21 of 22 cases of M/SI where gear was present (but the precise type of that gear was unidentifiable) involved vertical-line gear." *Id.*

20

Importantly, the 22 cases described in the Biological Opinion and referenced by the district court are all instances where NMFS determined the gear type was "unknown." A815. In 21 of those cases, the gear present was described as "lines" not "vertical lines" as the district court claimed. *Compare* A815 *with* A226. And "[w]ithout identifying marks," NMFS explained "we cannot know whether the line is from gillnet gear, trap/pot gear, or another source." A815.

The district court stated that "the agency's fourth and most significant conclusion" was that "99.7% of vertical lines in the relevant area are from trap/pot lines." A226. The district court reasoned that right whales interact with lines "in rough proportion to their presence in the water." *Id.* This is an incomplete statement; therefore, it is false. The risk of entanglement is determined by two factors: the presence of gear and the likelihood that the area where the gear is present overlaps with occurrence of right whales. A807-08. As a consequence, there are areas where there is a high proportion of lines in the water but the risk of entanglement is very low because the potential for right whale occurrence in those areas is low. In fact, as Maine pointed out when commenting on the draft Biological Opinion, Maine's exempt waters typically contain 73 percent of the vertical lines in the Maine lobster fishery but account for just three percent of the risk of entanglement of right whales. A1225. It was unreasonable for NMFS to disregard the best available data regarding entanglement by gear type and attribute 100 percent of entanglements where the gear was unknown to the lobster fishery

21

on the basis of the arguments presented to and accepted by the district court.  By

doing so, NMFS violated its duty to "use the best scientific and commercial data

available," 16 U.S.C. § 1536(a)(2), and failed to "examine the relevant data and

articulate a satisfactory explanation for its action."  *State Farm*, 463 U.S. at 43.

### 3.    NMFS erred by disregarding the data on natural mortality of right whales.

NMFS further erred when it attributed <u>zero</u> right whale mortality to natural

causes.  A819 ("Natural mortality is not included in the apportionment as there is

little evidence showing this to be a cause of right whale mortality . . .").  This is

incorrect – peer-reviewed analyses in the record show that natural mortality does

occur.  Concluding otherwise led NMFS to improperly understate natural mortality

and overstate the effects of the lobster fishery (and other sources of entanglements

and vessel strikes) on right whales.

In the Biological Opinion, NMFS refers to all unobserved mortality of right

whales as cryptic mortality.  A810 ("Cryptic mortality refers to the death of an

animal without resulting in an observed carcass.").  Rather than further

differentiate between human- and natural-caused cryptic mortality, NMFS

apportions <u>all</u> cryptic mortality across vessel strikes and entanglements and to the

United States and Canada.  *Id*.  In other words, NMFS assumes away any natural

mortality.  Common sense dictates that all species have the potential to succumb to

non-anthropogenic sources of mortality (e.g., disease, predation, and lack of adequate prey).  Thus, on its face, the agency's assumption is arbitrary.

In addition, published, peer-reviewed analyses in the record provided evidence that, while most right whale mortality is anthropogenic, a significant proportion is natural.  For example, van der Hoop et al. (2012) specifically analyzed trends in cause-specific mortalities in large whales, including right whales.  A1926-37.  The authors examined large whale mortality data from the period 1970 to 2009.  A1928.  They summarized their findings in table 2 of the article, which reported that of the 122 right whale mortalities identified for that period, 70 were anthropogenic, 17 were natural, and 35 were undetermined.  A1936.  In other words, 17 of 87 mortalities (or 20 percent) where the source could be determined were natural mortalities.

Sharp et al. (2019) also analyzed right whale mortalities.  A1884-1914.  They focused on the period 2003-2018.  A1886.  The authors identified the cause of mortality in 43 of the 70 cases examined.  Of these, 5 of 43 (or 12 percent) are categorized as natural, all involving right whale calves.  A1889.  These published, peer-reviewed analyses considered by NMFS and included in the record utilize the best scientific and commercial data available and demonstrate that the position taken by NMFS – that there is zero natural mortality of right whales – is arbitrary.

While acknowledging that this argument has "intuitive appeal" (but ignoring that it is backed by actual data), the district court opined that natural mortality is

23

"not statistically significant."  A228.  "Statistically significant" is a term of art (denoting the probability that the results of a hypothesis test are due to chance rather than a relationship between the two variables being analyzed), and this is not an argument that NMFS made or is supported by the record and it should not be countenanced.

The district court also adopted the agency's argument that calf survival rates are unimportant to right whale population dynamics.  A229 (parroting the NMFS argument that "adult-female survival rates, not calf survival rates, are the key determinant of population dynamics").  But the district court misses the point. While the district court accurately asserted that "calves do not typically enter population counts until about six months old," *id.*, the underlying study to which the district court cited (Pace et. al 2017) explains that this is because six months is the time at which they "develop callosity patterns that make them identifiable." A1810.  The district court misconstrued a factual predicate for a supporting conclusion.  The point that Pace and colleagues were making was that estimating calf survival is difficult given the fact that calves cannot be individually identified until they are about 6 months old – thus, survival estimates for that class of whale (i.e., 0-1 year) are only based on about a half-year of data.  *See* A1809-10.  They were not saying that calf deaths are inconsequential.  In fact, Pace et al. point out that right whale calving rates are low.  A1810.  As a consequence, the relative biological value of each individual calf is high.  While the "population dynamics of

24

long-lived mammals are <u>typically sensitive</u> to adult female survival," A495

(emphasis added), calf reproduction and survival are also essential to a positive

population growth rate.  In any event, the assumption that all unknown right whale

mortality is attributable to human causes is belied by the best available data.  And

the agency has failed to provide a satisfactory explanation for its decision to turn a

blind eye to that data.  Therefore, NMFS violated the APA and ESA.  *E.g.*, *State*

*Farm*, 463 U.S. at 43 (under the APA, an agency must "examine the relevant data

and articulate a satisfactory explanation for its action").

## VII.  CONCLUSION

For the reasons set forth above, the State of Maine, through its Department

of Marine Resources, respectfully requests that this Court reverse the decision of

the district court, hold that the Biological Opinion violates the APA and ESA, and

remand the Biological Opinion to NMFS.  To prevent needless disruption and

harm to the State and its citizens, we request remand without vacatur of the

Biological Opinion.

Respectfully submitted,


Dated: November 9, 2022

/s/ Paul S. Weiland
Paul S. Weiland, D.C. Cir. No. 56111
Nossaman LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:949.833.7800

61054187

Facsimile: 949.833.7878
psweiland@nossaman.com

Brian Ferrasci-O'Malley, D.D.C. No. WA0024
Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone:206.395.7630
Facsimile: 206.257.0780
bferrasciomalley@nossaman.com

*Attorneys for Intervenor-Plaintiff-Appellant STATE
OF MAINE DEPARTMENT OF MARINE
RESOURCES*

61054187

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE, AND TYPE STYLE REQUIREMENTS**

This response complies with the length limit in Fed. R. Civ. P. 27(d)(2)(A), because the response contains 5,842 words.

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The response has been prepared using 14 point Times New Roman font.

Dated:  November 9, 2022        */s/ Paul S. Weiland*
                                Paul S. Weiland (D.C. Cir. No. 56111)

27

61054187

## CERTIFICATE OF SERVICE

In accordance with F.R.A.P. 25(d), and the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that on November 9, 2022, I electronically filed the foregoing by using the Court's CM/ECF system and that service will be accomplished by the appellate CM/ECF system on all participants registered in this case as CM/ECF users.


*/s/ Paul S. Weiland*
Paul S. Weiland

61054187

**ADDENDUM**

61054187

## ADDENDUM TABLE OF CONTENTS

Page:

16 U.S.C. § 1536 ................................................................................. 31

50 C.F.R. § 402.02 ............................................................................. 32

61054187

**16 U.S.C. §1536.  Interagency cooperation**

**(a) Federal agency actions and consultations**

…

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

61054187

**50 C.F.R. §402.02 Definitions.**

…

*Effects of the action* are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

61054187