**ARGUMENT SCHEDULED FOR FEBRUARY 24, 2023**

Nos. 22-5238(L), 22-5244, 22-5245, 22-5246

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MAINE LOBSTERMEN'S ASSOCIATION,

*Plaintiff – Appellant*,

STATE OF MAINE DEPARTMENT OF MARINE RESOURCES, *et al.*,

*Intervenors – Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE, *et al.*,

*Defendants – Appellees*,

CONSERVATION LAW FOUNDATION, *et al.*,

*Intervenors – Appellees.*

Appeal from the United States District Court
for the District of Columbia, No. 1:21-cv-2509-JEB
Honorable James E. Boasberg, U.S. District Court Judge

**RESPONSE BRIEF FOR FEDERAL APPELLEES**

| | |
|---|---|
| | TODD KIM |
| | *Assistant Attorney General* |
| | ANDREW C. MERGEN |
| | RACHEL HERON |
| | J. BRETT GROSKO |
| Of Counsel: | TAYLOR A. MAYHALL |
| | SOMMER H. ENGELS |
| JOHN ALMEIDA | *Attorneys* |
| MARK CAPONE | Environment and Natural Resources Division |
| SAM DUGGAN | U.S. Department of Justice |
| *Attorney-Advisors* | Post Office Box 7415 |
| | Washington, D.C. 20044 |
| NOAA Office of General Counsel | (202) 353-7712 |
| Gloucester, Massachusetts | sommer.engels@usdoj.gov |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    **Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Opening Brief for the Maine Lobstermen's Association.

### B.    **Rulings Under Review**

References to the ruling at issue appear in the Opening Brief for the Maine Lobstermen's Association.

### C.    **Related Cases**

*Center for Biological Diversity v. Raimondo*, No. CV 18-112 (JEB), 2022 WL 2643535 (D.D.C. July 8, 2022), is a related case within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Sommer H. Engels*
SOMMER H. ENGELS

Counsel for Federal Appellees

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

GLOSSARY.......................................................................................... viii

INTRODUCTION .....................................................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF THE ISSUES.............................................................3

PERTINENT STATUTES AND REGULATIONS .................................3

    A.    Statutory and regulatory background ....................................3

        1.    Endangered Species Act ...........................................3

        2.    Marine Mammal Protection Act ...............................5

    B.    Factual background .................................................................8

        1.    North Atlantic Right Whale .......................................8

        2.    Right whale protections and population trends .........8

        3.    2021 Take Reduction Plan Amendment Rule..........10

        4.    Fisheries Biological Opinion ...................................11

            a.    Conservation Framework ...............................11

            b.    Scientific Analysis .........................................13

    C.    Related litigation ..................................................................16

        1.    *Center for Biological Diversity v. Raimondo* ...........16

        2.    *District 4 Lodge v. Raimondo* ...................................17

    D.    Proceedings below...............................................................18

SUMMARY OF ARGUMENT ............................................................20

STANDARD OF REVIEW ...............................................................22

ARGUMENT ...................................................................................23

I.    The Opinion applied the best scientific and commercial data
      available. ...............................................................................23

      A.    The Service reasonably allocated to the United States
            half of the mortalities of unknown geographic origin.........................24

      B.    The Service reasonably allocated all unknown-gear
            entanglements that resulted in mortality to trap/pot gear....................29

      C.    The Service reasonably accounted for cryptic mortalities. .................35

      D.    Plaintiffs' remaining criticisms of the Service's scientific
            analysis are unwarranted. ...................................................39

II.   The Service's approach complied with Section 7(a)(2) of the
      Endangered Species Act. .......................................................41

III.  The Framework complied with the Endangered Species Act. .....................49

CONCLUSION ...............................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Am. Iron & Steel Inst. v. EPA*,
  115 F.3d 979 (D.C. Cir. 1997)........................................................38

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008)...............................................22, 23

*Appalachian Power Co. v. EPA*,
  249 F.3d 1032 (D.C. Cir. 2001)..................................................25

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983)................................................................22, 43

*Bauer v. Fed. Deposit Ins. Corp.*,
  38 F.4th 1114 (D.C. Cir. 2022)....................................................21

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................................55

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
  247 F.3d 1241 (D.C. Cir. 2001)..................................................32

*Center for Biological Diversity v. Raimondo*,
  2022 WL 2643535 (D.D.C. July 8, 2022)....................................17

*Center for Biological Diversity v. Raimondo*,
  2022 WL 17039193 (D.D.C. Nov. 17, 2022).........................12, 17

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988).............................................44, 47

*Dist. 4 Lodge v. Raimondo*,
  18 F.4th 38 (1st Cir. 2021)..........................................................18

*Dist. 4 Lodge v. Raimondo*,
  40 F.4th 36 (1st Cir. 2022)...............................18, 26, 28, 29, 51

*Center for Biological Diversity v. Ross*,
 480 F. Supp. 3d 236 (D.D.C. 2020)............................................................16

*Dow AgroSciences LLC v. NMFS*,
 707 F.3d 462 (4th Cir. 2013) ......................................................................52

*Eldred v. Ashcroft*,
 255 F.3d 849 (D.C. Cir. 2001)....................................................................56

*Hawksbill Sea Turtle v. FEMA*,
 126 F.3d 461 (3d Cir. 1997) ......................................................................47

*In re Polar Bear ESA Listing*,
 709 F.3d 1 (D.C. Cir. 2013).............................................................29, 33, 40

*Lane Cty. Audubon Soc'y v. Jamison*,
 958 F.2d 290 (9th Cir. 1992) ................................................................50, 54

*Miccosukee Tribe of Indians of Fla. v. United States*,
 566 F.3d 1257 (11th Cir. 2009) ..................................................................44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
 463 U.S. 29 (1983)......................................................................................22

*Nat'l Fam. Farm Coal. v. EPA*,
 966 F.3d 893 (9th Cir. 2020) ......................................................................43

*Nw. Coal. for Alts. to Pesticides v. EPA*,
 544 F.3d 1043 (9th Cir. 2008) ....................................................................44

*Pac. Rivers Council v. Thomas*,
 30 F.3d 1050 (9th Cir. 1994) ................................................................50, 54

*Roosevelt Campobello Intern. Park Comm'n v. EPA*,
 684 F.2d 1041 (1st Cir. 1982)........................................................44, 45, 47

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
 747 F.3d 581 (9th Cir. 2014) ......................................................................43

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
 992 F.3d 1071 (D.C. Cir. 2021)............................................................22, 39

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978).......................................................................43, 44

*Turtle Island Restoration Network v. NMFS*,
    438 F.3d 937 (9th Cir. 2006) ...........................................................4

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)....................................................................55

**Statutes**

5 U.S.C. §§ 701-706............................................................................2

5 U.S.C. § 706....................................................................................22

16 U.S.C. § 1361..................................................................................6

16 U.S.C. § 1371................................................................................16

16 U.S.C. § 1421c.................................................................................9

16 U.S.C. §§ 1531-1544 .......................................................................2

16 U.S.C. § 1531..................................................................................4

16 U.S.C. § 1532..................................................................................5

16 U.S.C. § 1536.................................... 4, 5, 23, 43, 44, 52, 53, 54

28 U.S.C. § 1291..................................................................................2

28 U.S.C. § 1331..................................................................................2

Pub. L. No. 93-205 § 7 (1973).........................................................46

Pub. L. No. 96-159 § 4 (1979)....................................................45, 47

**Rules**

Fed. R. App. P. 4(a)(1)(B) ..................................................................2

## Regulations

50 C.F.R. § 216.3 .................................................................. 6

50 C.F.R. § 216.103 .............................................................. 7

50 C.F.R. § 229.2 .................................................................. 6

50 C.F.R. § 402.02 ......................................................... 4, 45, 52

50 C.F.R. § 402.13 .................................................................. 4

50 C.F.R. § 402.14 ......................................................... 4, 5, 45

50 C.F.R. § 402.15 .......................................................... 52, 54

50 C.F.R. § 402.17 ................................................................ 46

50 C.F.R. § 451.02 .......................................................... 52, 54

## Other Authorities

35 Fed. Reg. 18,319 (Dec. 2, 1970) ........................................ 8

60 Fed. Reg. 8,729 (Feb. 15, 1995) ....................................... 44

62 Fed. Reg. 39,157 (July 22, 1997) ....................................... 9

84 Fed. Reg. 44,976 (Sept. 26, 2019) .................................... 45

86 Fed. Reg. 51,970 (Sep. 17, 2021) ......................... 11, 37, 52

87 Fed. Reg. 55,405 (Sept. 9, 2022) ..................................... 10

H.R. Conf. Rep. No. 95-1804 (1978) ..................................... 53

S. Rep. No. 95-874 (1978) .................................................... 53

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| the Committee | Endangered Species Committee |
| Conservation Framework/Framework | North Atlantic Right Whale Conservation Framework for Fisheries in the Greater Atlantic Region |
| Dist. 4 Br. | Opening Brief of the District 4 Lodge of the International Association of Machinists and Aerospace Workers |
| MLA Br. | Opening Brief of the Maine Lobstermen's Association |
| MALA Br. | Opening Brief of the Massachusetts Lobstermen's Association |
| MSCC Br. | Amicus Brief of the Maine State Chamber of Commerce |
| ME Br. | Opening Brief of the State of Maine Department of Marine Resources |
| NH Br. | Amicus Brief of the State of New Hampshire |
| the Opinion | 2021 Fisheries Biological Opinion |
| Right whale | North Atlantic Right Whale |
| the Rule | 2021 Take Reduction Plan Amendment Rule |
| the Service | National Marine Fisheries Service |

## INTRODUCTION

Plaintiffs in this case, representatives and proponents of the lobster industry, challenge a biological opinion issued by the National Marine Fisheries Service ("the Service") that evaluated whether its continued authorization of several fisheries in the federal waters of the Greater Atlantic region—including the lobster fishery—would jeopardize the continued existence of the North Atlantic Right Whale ("right whale"), a critically endangered species numbering in the hundreds.

Entanglement in fishing gear—particularly the sort of gear used in the Greater Atlantic fisheries—is the most common cause of right whale mortality. The Service determined in 2020 that modifications to the fisheries would be necessary to comply with the Endangered Species Act and the Marine Mammal Protection Act. Thus, it developed the "North Atlantic Right Whale Conservation Framework for Fisheries in the Greater Atlantic Region" ("Conservation Framework" or "Framework")—a commitment to promulgate a series of regulations to substantially reduce right whale mortalities between 2021 and 2030.

The Service then analyzed the fisheries as they would operate under the Framework. In doing so, it applied the best available scientific and commercial data and used its informed expert judgment to resolve uncertainties in that data. It ultimately concluded that the continued authorization of the fisheries would not jeopardize the right whale, which meant the fisheries could remain open.

1

Plaintiffs disagree with the Service's analysis, but they have not shown it to be arbitrary or capricious. *First*, as the First Circuit has already recognized in related litigation, Plaintiffs' assertions that the Service should have evaluated uncertainties in the existing available data differently fall far short of showing that the Service was arbitrary and capricious. *Second*, Plaintiffs' efforts to recast their critiques of the Service's scientific analysis as statutory arguments are misplaced. This is a standard record-review case, not a complex statutory one. *Third*, Plaintiffs' argument that the Service erred by proactively considering its statutory obligations when developing its authorization decision is wrong both as a matter of law and as a matter of good government. This Court should affirm the decision below.

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

(B)    This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final order disposing of all parties' claims. A208.

(C)    That order was entered on September 8, 2022. *Id.* Plaintiffs filed timely notices of appeal on September 13, 20, and 21. A6; *cf.* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

Plaintiffs challenge the Service's biological opinion and assert that it must be remanded. This appeal raises three issues:

1. Whether the Service's assessment that federal fisheries are responsible for an average of about 4.7 right whale mortalities each year was based on the best scientific and commercial data available.

2. Whether Section 7 of the Endangered Species Act permitted the Service to resolve uncertainties in favor of the right whale, where the best available data yielded uncertainties and the Service's resolutions of those uncertainties fell within reasonably likely outcomes.

3. Whether the Service's creation and application of the Conservation Framework was consistent with Section 7 of the Endangered Species Act.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are attached to Plaintiffs' opening briefs.

## STATEMENT OF THE CASE

**A.    Statutory and regulatory background**

**1.    Endangered Species Act**

Congress passed the Endangered Species Act in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such

endangered species and threatened species." 16 U.S.C. § 1531(b). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

Section 7 of the Endangered Species Act directs federal agencies to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or to destroy or adversely modify designated critical habitat. *Id.* § 1536(a)(2); *see* 50 C.F.R. § 402.02 (defining "jeopardize"). In fulfilling this requirement, the agencies "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

The Endangered Species Act establishes a process to help agencies carry out this mandate. When an "action agency" proposes a federal action that "may affect" listed species or critical habitat, it must engage in consultation with the appropriate "consulting agency." 50 C.F.R. §§ 402.13-402.14; 16 U.S.C. § 1536(a)(3)-(4).[1] If a proposed action is likely to *adversely* affect a listed species, then the consulting agency must prepare a biological opinion. 50 C.F.R. § 402.14(h). A biological opinion provides the consulting agency's "opinion on whether the action is likely to

---

[1] In some cases, like this one, different offices within the Service can function as the action agency and consulting agency. This is common where one component takes actions that affect a species that another component is charged with protecting. *See, e.g.*, *Turtle Island Restoration Network v. NMFS*, 438 F.3d 937, 941 (9th Cir. 2006).

jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(h)(1).

If the biological opinion concludes that the proposed action *is* likely to jeopardize the continued existence of a listed species, then it must identify any "reasonable and prudent alternatives" to the action that would prevent such harm. 16 U.S.C. § 1536(b)(3)(A); *see* 50 C.F.R. § 402.14(h)(2). If it reaches a no-jeopardy conclusion, on the other hand, then the opinion will include an "incidental take statement" setting forth the level of "take" expected to result from the proposed action, along with "reasonable and prudent measures" necessary to reduce impacts. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *see* 16 U.S.C. § 1532(19) (defining "take").

Before issuing an incidental take statement under the Endangered Species Act for a listed *marine mammal*, the consulting agency must also confirm that the taking is authorized by the Marine Mammal Protection Act. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i). Any incidental take statement must also specify "those measures that are necessary to comply" with the Marine Mammal Protection Act. 50 C.F.R. § 402.14(i)(1)(iii).

### 2.    Marine Mammal Protection Act

The Marine Mammal Protection Act's "major objective" is to ensure that marine mammals "not be permitted to diminish beyond the point at which they cease

to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). The Act broadly prohibits the take of marine mammals "on the high seas" or in "waters or on lands under the jurisdiction of the United States." *Id.* § 1372(a); *see id.* § 1371(a).

This prohibition has certain exceptions. Relevant here, Section 118 of the Marine Mammal Protection Act allows the "incidental taking" of marine mammals in federally authorized fisheries, whose operations are only lawful to the extent authorized by the Service. *Id.* § 1387(a)(1).

Section 118's primary mechanisms for meeting the Marine Mammal Protection Act's goals are "take reduction plans" and "take reduction teams." *Id.* § 1387(f). Take reduction plans are "designed to assist in the recovery or prevent the depletion of each strategic stock [including right whales] which interacts with a commercial fishery." *Id*. § 1387(f)(1). The immediate goal of a take reduction plan is to "reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level" established for that stock. *Id.* § 1387(f)(2); *see id.* § 1387(f)(5)(A).[2] The potential biological removal level is "the maximum number of animals, not including natural

---

[2] A "serious injury" is any injury that will likely result in mortality. 50 C.F.R. §§ 216.3, 229.2. Unless otherwise specified, references in this brief to "mortalities" refer to both mortalities and serious injuries.

6

mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20); *see id.* § 1362(9) (defining "optimum sustainable population").

The Service prepares take reduction plans in coordination with a "take reduction team," a group with expertise in the conservation or biology of marine mammal species or in the fishing practices that affect those species. *Id*. § 1387(f)(6). The team includes stakeholders from fishery management councils and commissions, conservation organizations, and the fishing industry. *Id.* The Service must also work with the team to amend the plans, when necessary. *Id*. § 1387(f)(7)(F).

Additional restrictions apply to incidental takes of "depleted" marine mammal populations. *Id.* § 1387(a)(2). Right whales are a depleted species because their population is "below its optimum sustainable population" and because the whale is listed as endangered under the Endangered Species Act. *See id.* § 1362(1) (defining "depleted"). The Service may allow the incidental taking of individuals from depleted populations for a three-year period if it determines that the taking will have a "negligible impact" on the species or stock. *Id.* § 1371(a)(5)(E); *see* 50 C.F.R. § 216.103 (defining "negligible impact").

7

**B.    Factual background**

**1.    North Atlantic Right Whale**

Right whales are large whales with stocky bodies and no dorsal fin. A679. The North Atlantic right whale spends the spring and summer months foraging off the coasts of southern New England and Canada and the fall and winter months calving between the mid-Atlantic States and Florida. A679, 922.

Entanglement in fishing gear is the leading cause of mortality in adult right whales. A681-83; *see* A246 (noting that nearly 85 percent of right whales have been entangled at least once). Some entangled right whales die in place; others travel for extended periods or over long distances—sometimes hundreds of miles—before disentanglement or death. A683, 735, 807. The fact that entangled whales may travel long distances and may no longer bear identifiable gear when discovered often makes it difficult to link the entanglement to a particular fishery. A484, 683; *see* A814 ("Assignment of an observed entanglement event to a specific fishery or country of origin is rarely possible.").

**2.    Right whale protections and population trends**

The right whale was listed as endangered in 1970 and has been protected by the Marine Mammal Protection Act's take moratorium since 1972. *See* 35 Fed. Reg. 18,319, 18,320 (Dec. 2, 1970). The Service issued the first take reduction plan for

right whales in 1997, 62 Fed. Reg. 39,157 (July 22, 1997), and it has amended the plan and associated regulations several times since, A1072.

Between 1990 and 2011, the right whale population grew by 2.8 percent each year, peaking in 2011 at around 481 individuals. A680. But then the population started to decline, falling to 451 individuals by the end of 2016. A1363. Around that same time, scientists also began noticing meaningful and sustained increases in the temperature of the Gulf of Maine and a decrease in right whale prey abundance. A785, 813; *see* A813 (classifying this change as a "regime shift"—a large, abrupt, and persistent change in an ecosystem). These changes corresponded with a sharp increase in mortalities. In 2017, 17 mortalities were observed. A680-82. This increase in mortalities was coupled with a decline in calving rates, yielding an even deeper drop in the total right whale population. A244, 681, 811.

The Service designated the increase in mortalities an "unusual mortality event," *see* 16 U.S.C. § 1421c, which triggered a formal investigation, A812-13. The Service determined that although vessel strikes caused some of the mortalities, most were caused by fishing gear. A680, 817-18. The Service identified several reasons for the uptick in entanglements. One was an expansion in the whales' range, exposing them to vessel traffic and fisheries in Canadian waters. A244, 813. The American lobster fishery was also moving farther offshore, increasing the overlap

between fishing activity and right whale foraging areas and migration corridors. A244.

By 2019, fewer than 370 right whales remained, the population "face[d] a high risk of extinction," and the "population size [was] small enough for the death of any individuals to have measurable effects" on the population's "status, trend, and dynamics." A921. At that time, the whale's potential biological removal level was 0.8, which meant that only eight whales could be killed or seriously injured every 10 years if the population is to reach its optimum sustainable population—less than one each year. A368. If losses continue at the current observed rate, the right whale population "could decline past a point of no return in just a few decades." A1362.[3]

### 3.    2021 Take Reduction Plan Amendment Rule

The Service responded to 2017's unusual mortality event by reconvening the right whale take reduction team to recommend amendments to the right whale take reduction plan. A367. The team—which included some of the plaintiffs present here—recommended reducing the number of lines in the water and reducing line strength. A368. The Service reviewed these recommendations and assessed additional options for achieving the necessary protections. *Id.* After soliciting public comments on a proposed rule and draft environmental impact statement, A372, and

---

[3] The whale's potential biological removal level has since fallen to 0.7. 87 Fed. Reg. 55,405, 55,407 (Sept. 9, 2022).

engaging in informal consultation, A378-79, the Service issued the final amendment rule ("the Rule") in September 2021, 86 Fed. Reg. 51,970 (Sep. 17, 2021); A360-77. The Rule restricts the use of trap/pot gear in particular areas during particular periods, reduces line density, and requires gear modifications and markings, among other measures. A368-72.

### 4.    Fisheries Biological Opinion

In October 2017, the Service's Sustainable Fisheries Division—the Service's action component—reinitiated consultation under the Endangered Species Act on its authorization of ten federal fisheries in the Greater Atlantic region (hereinafter "the federal fisheries" or "the fisheries"), including the lobster fishery. A599.

### a.    Conservation Framework

The Protected Resources Division—the Service's consulting component—determined during preparation of the biological opinion that "[g]iven the declining status of the . . . right whale, these federal fisheries will need to continue to reduce their impact on the species over time to meet both Endangered Species Act and Marine Mammal Protection Act mandates." A447, 599. So it developed the Conservation Framework:  a program to "reduc[e] serious injury and mortality of right whales in the Federal fisheries" by 95 percent—approaching negligible levels—by 2030. A447; *see* A531, 1070-80. The Framework was created by Protected Resources Division staff with input from the Sustainable Fisheries

11

Division. A447; *see* A531 (explaining that the two offices worked together to ensure that the proposed action was appropriately defined).

The Framework will proceed in several phases. The first phase was the Rule, described above. A1076-77.[4] In the next phases, the Service will promulgate regulations to reduce the average annual number of mortalities to particular levels. A606-07, 923. The Framework confirms the Service's commitment to reducing mortalities, but it does not identify specific measures to achieve those reductions. A606-07, 1077. The Service will develop those measures through an "adaptive management approach," A1074, according to the best available data (*e.g.*, population status, effectiveness of ongoing conservation measures, etc.) during each rulemaking, A1075-77. This approach is intended to provide "flexibility to the fishing industry," A1071, and the Service will work with stakeholders to develop and implement specific measures, A1078.

---

[4] The Service originally planned to implement the Framework in four phases in 2021, 2023, 2025, and 2030. A1076-77. As explained below at pp.16-17, however, the Rule was recently remanded to the Service without vacatur in a related case. *Center for Biological Diversity v. Raimondo*, No. CV 18-112 (JEB), 2022 WL 17039193, at *3 (D.D.C. Nov. 17, 2022). The Service must promulgate a new rule by December 2024, and it now plans to combine phases 2 and 3.

### b.    Scientific Analysis

In May 2021, the Service's Protected Resources Division released its biological opinion ("the Opinion") evaluating the continued authorization of the federal fisheries as they would operate under the Framework. A447, 604-09, 1071.

In its analysis, the Service predicted how many right whale mortalities would be attributable to the federal fisheries each year. A812-22. It used this figure to determine whether continued authorization of the fisheries would comply with the Endangered Species Act and the Marine Mammal Protection Act. A922-40; *see supra* p.5 (explaining link to Marine Mammal Protection Act).

To calculate this mortalities-per-year figure, the Service collected data sets documenting observed right whale mortalities between 2010 and 2018. A810, 813-19. Although they were the best available data, these observational data sets still included unknowns. A818. One data set, for example, documented 48.5 mortalities due to entanglement but could attribute only a few of the mortalities to a particular country—7.75 to Canada, and 2 to the United States. A813-14, 816, 818.[5] Of those two U.S. entanglements, one was from trap/pot gear; the other gear type was unknown. A818. Another data set documented one mortality confirmed to the United States but lacked information about cause. A819. Yet another data set documented

_____

[5] Mortality figures are presented in non-whole numbers because the Service may prorate an injury or mortality to account for missing information. A809.

13

12 right whale mortalities but lacked data attributing those mortalities to a particular country or cause (i.e., vessel strikes versus entanglements). *Id.*

The observed data was also under-representative. Indeed, the Service knew based on extensive population studies that 110.46 *additional* mortalities had occurred between 2010 and 2018 that were not included in the observed data. A810, 819. Unobserved mortalities are called "cryptic mortalities" in the scientific literature. *See* A810 & n.23. And although the Service was confident that these cryptic mortalities had occurred, it lacked information about their geographic origin, causes, and associated gear type. A819.

Thus, the Service had to figure out how many mortalities presented in the data (both observed and unobserved), were attributable to the federal fisheries under review—that is, not attributable to Canadian fisheries, vessel strikes, or state fisheries. A818. It also had to identify the sorts of gear responsible for the mortalities to decide how to prioritize reductions among the fisheries. A484, 814-17, 821-22.

To complete these tasks, the Service developed several rules to solve for unknowns in the available data, based on that data and the Service's expertise. A812-22. It first decided to allocate half of all mortalities of unknown geographic origin to Canada and half to the United States. A480-81, 814-15. It did so after considering not only observed data, but also the density and line types in each country's waters, and the whales' migration timing and patterns. A814-15.

It then decided to allocate 77 percent of all mortalities with an unknown cause to entanglement, and the remainder to vessel strikes. A481, 817-18. It allocated all mortality-causing entanglements with unknown gear to trap/pot gear and none to gillnet gear, considering known entanglements, known mortalities, and the characteristics of each type of gear. A481-84, 815-17. Finally, it allocated 60.4 percent of serious entanglements in U.S. waters to federal fisheries and the rest to state fisheries, using a model that considered relative risk. A485, 817. After applying those rules to solve for uncertainties in the data, the Service calculated that the federal fisheries are responsible for about 4.7 right whale mortalities each year. A820-22.

The Service then used that figure to determine the trajectory of the female right whale population over the next 50 years with and without the continued authorization of the federal fisheries. A928-34. The Opinion concluded that under the Framework, the authorization of the federal fisheries is not expected "to cause an appreciable reduction in the likelihood of survival of the species" or have "consequential effects on" the right whale's "potential for recovery." A940; *see* A922-40. The Opinion also observed that although the current right whale population estimate is "extremely low," the figure had been lower in the past, suggesting that "the population is capable of recovering at lower levels than the current estimate." A940.

15

Despite reaching a no-jeopardy conclusion under the Endangered Species Act, the Opinion explained that "the need for further efforts among stakeholders to reduce large whale/fishery interactions and achieve the zero mortality goal of the [Marine Mammal Protection Act] is not diminished by these no-jeopardy conclusions." A988. It allowed the incidental non-lethal take of right whales but authorized "zero lethal take" "because the lethal incidental take of . . . listed whales has not been authorized" under the Marine Mammal Protection Act. *Id.* (citing 16 U.S.C. § 1371(a)(5)). The Opinion also included reasonable and prudent measures directing the Sustainable Fisheries Division to mitigate and study the fisheries' effects on listed species. A990-95.

### C. Related litigation

#### 1. *Center for Biological Diversity v. Raimondo*

While consultation was underway in 2019, a coalition of conservation groups—defendants-intervenors here—challenged the preexisting fisheries biological opinion asserting that it violated the Endangered Species Act, the Marine Mammal Protection Act, and the Administrative Procedure Act ("APA"). In August 2020, the District Court for the District of Columbia agreed, remanded to the Service, and vacated a portion of the opinion. *Center for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 256 (D.D.C. 2020). Vacatur was stayed until May 2021 to allow the Service to complete its already pending consultation. *Id.*

16

In September 2021, once the pending consultation was complete, the conservation groups amended their complaint to challenge the Opinion, alleging that it violated both the Endangered Species Act and the Marine Mammal Protection Act because, among other reasons, it authorized a non-negligible level of take. *Center for Biological Diversity v. Raimondo*, No. CV 18-112 (JEB), 2022 WL 2643535, at *7 (D.D.C. July 8, 2022). They also challenged the Rule, asserting that it was insufficiently protective. *Id.*

The district court granted the groups' motion for summary judgment, denied the motions filed by defendants, and requested additional briefing on remedy. *Id.* at *11, 19. In November 2022, the district court remanded the Rule without vacatur and ordered the agency to finalize a new rule by December 9, 2024. *Raimondo*, 2022 WL 17039193, at *3. It also remanded the Opinion and held the question of vacatur in abeyance pending issuance of the final rule. *Id.* Finally, the court ordered the parties to file a joint status report by July 10, 2023, and every six months thereafter. *Id.*

### 2. *District 4 Lodge v. Raimondo*

In September 2021, the same month the conservation groups challenged the Rule as insufficiently protective, industry plaintiffs filed suit in the District of Maine asserting that the Rule was too restrictive. The district court preliminarily enjoined the Rule, but the First Circuit vacated the injunction, holding that the plaintiffs'

17

claims—some of which mirror claims advanced here—were unlikely to succeed. *Dist. 4 Lodge v. Raimondo*, 40 F.4th 36, 39-42 (1st Cir. 2022); *see Dist. 4 Lodge v. Raimondo*, 18 F.4th 38, 49-50 (1st Cir. 2021) (granting federal appellants' motion for stay pending appeal). On remand to the district court, the parties stipulated to dismissal with prejudice. Although Plaintiffs reference the Rule in their briefs, *see, e.g.*, MLA Br. 20, 28; NH. Br. 18-19, they do not challenge the Rule in this appeal.

### D.    Proceedings below

The Maine Lobstermen's Association filed this suit in September 2021 and was promptly joined by the State of Maine Department of Marine Resources, Massachusetts Lobstermen's Association, and District 4 Lodge. A3-4. In September 2022, the district court denied Plaintiffs' motions for summary judgment and granted those filed by defendants and defendants-intervenors. A210-42.

The court first held that the Service's Opinion appropriately resolved uncertainty in favor of the endangered whale, and that in doing so, did not "purport to displace the best available data, only to supplement it where the data ran out." A221. As the court put it, the Service "did not use a substantive presumption to displace scientific judgment" it only explained that it "resolve[d] uncertainty when the best science left it a range of possible options." A221-22. That approach, the court held, "was rational and thus passes muster under arbitrary-and-capricious review" and was also "consistent with the [Endangered Species Act]." A222.

18

The court then rejected Plaintiffs' criticisms of the methods the Service used to allocate right whale mortalities of unknown geographic origin between the United States and Canada and then between different gear types. A223-25. The court concluded that the Service carefully examined the available data and articulated a reasonable connection between that data and the Service's chosen methods. A223, 225-26. Plaintiffs, the court recognized, were "unable to identify specific reliable data that the agency overlooked or other material gaps in its reasoning." A227.

The court upheld the Service's cryptic-mortality calculations too. A227-29. It credited the Service's conclusion that omitting cryptic mortalities from the death tallies would understate right whale mortalities, and it held that the Service's method for calculating those mortalities found support in the record. A227. It further held that the Service reasonably attributed those mortalities to humans, and not natural causes. A228-29.

Finally, the court held that Framework was lawfully part of the agency action under review and was thus properly considered part of the Opinion. A233-39. It also concluded that the Framework's end goal—to reduce mortalities caused by the federal fisheries by 95 percent—was an appropriate exercise of the agency's discretion and properly reflected mandates imposed by the Marine Mammal Protection Act. A236-37. Finally, it concluded that the development of the

Framework was within the Service's authority and consistent with the Endangered Species Act. A238-39. This appeal followed.

## SUMMARY OF ARGUMENT

The task before the Service was to determine whether and under what conditions an industry that presents a known hazard to the critically endangered right whale can continue to operate, consistent with the protections that Congress has chosen to afford the whale. Plaintiffs assert that Service scientists manipulated data, acted like a "child playing a fantastical game," and worked in the "zealous but unintelligent pursuit" of a singular goal: to shut down the lobster industry. As the district court correctly recognized, however, the Service faithfully applied the best available data and reasonably exercised its expert judgment when that data yielded uncertainties at the margins. Plaintiffs may disagree with the Service's methods, but they have not shown them to be arbitrary or capricious. This Court should affirm.

First, Plaintiffs' criticisms of the Service's models and methods are meritless; indeed, the First Circuit has already rejected several of those criticisms in related litigation. Plaintiffs contend that the Service ignored the best available scientific and commercial data, but the record shows just the opposite. The Service applied that data, reasonably explaining its approach and rationale along the way. Plaintiffs identify no available data that the Service overlooked, and their disagreement with the Service's methods does not make them arbitrary and capricious.

Next, Plaintiffs err in asserting that the Service applied an unfounded "worst-case scenario" approach that caused it to ignore available data and rational judgment. The record shows that the Service adopted no such approach; instead, it applied the best available data and decided, in instances of uncertainty, to resolve the uncertainty in favor of more protective outcomes for the critically endangered whale. This approach was consistent with applicable law and longstanding agency guidance. Plaintiffs' contrary argument conflates the statutory standard the Service must apply with the distinct question of how the Service should resolve gaps in the data when applying that standard.

Finally, the Service's decision to develop the Framework and then analyze in its Opinion the fisheries as they would operate under the Framework was well within its authority. Plaintiffs' assertions to the contrary attack a strawman Framework that bears little similarity to the actual Framework. Further, the Service did not bypass any economic analysis or necessary procedures mandated by the Endangered Species Act when it decided to modify the proposed action while consultation was ongoing, rather than waiting until the end of the process. The Service used its authority as Congress intended and in a manner reasonably designed to ensure the survival of both the right whale and the fisheries.

## STANDARD OF REVIEW

This Court reviews summary judgment rulings de novo and applies the same standard of review as the district court. *Bauer v. Fed. Deposit Ins. Corp.*, 38 F.4th 1114, 1121 (D.C. Cir. 2022).

An agency's compliance with the Endangered Species Act is reviewed under the deferential standard of the APA. Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The plaintiff bears the burden to show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In reviewing an agency's "scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). If the science is uncertain, courts must "proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000-01 (D.C. Cir. 2008) (citation omitted).

## ARGUMENT

**I.    The Opinion applied the best scientific and commercial data available.**

Section 7(a)(2) of the Endangered Species Act directs the Service to "use the best scientific and commercial data available" when evaluating whether a proposed action is likely to jeopardize a species. 16 U.S.C. § 1536(a)(2). This means that the Service "may not base its decisions on speculation or surprise or disregard superior data." *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (internal citation and alterations omitted). Once an agency evaluates the best available scientific and commercial data and articulates a reasonable rationale for its decision, then the Endangered Species Act and APA are satisfied. *Am. Wildlands*, 530 F.3d at 1000.

Plaintiffs assert that the Service ignored the best available data at three points in its analysis. *First*, they contend that the Service erred in deciding to divide mortalities of unknown geographic origin equally between Canada and the United States. *Second*, they assert that the Service erred when it allocated all serious entanglements with unknown gear to trap/pot gear. *Third*, they disagree with the Service's decision to attribute all cryptic mortality to humans. Because Plaintiffs' critiques do not show that the Service disregarded the best available data or that its analysis was otherwise arbitrary or capricious, the Court should affirm.

**A.** **The Service reasonably allocated to the United States half of the mortalities of unknown geographic origin.**

As explained above at p.14, the Service divided right whale mortalities of unknown geographic origin equally between the United States and Canada. Plaintiffs disagree with the way the Service used the data before it, ME Br. 12-17; Dist. 4 Br. 14-17; MALA Br. 11; MLA Br. 36; NH Br. 9-18, but they identify no data the Service disregarded, and their disagreement with the Service does not undermine the Service's analysis or conclusion.

The Opinion identified several possible methods for allocating mortalities based on the best available data before explaining why an even split was appropriate. A814-15. One method would have apportioned the events based on the amount of time the whales historically spent in each country's waters. Under this approach, the Service "likely would have assigned a higher than 50 percent portion of unknown sources to U.S. fisheries." *Id.*; *see* A479-80 (describing recent studies indicating that the whales spend more time in U.S. waters). Because right whales are "increasingly occurring in Canadian waters," however, the Service decided it did not have enough data to support the use of this method. A480, 815.

Another method would have apportioned the events based on known mortality risks in Canadian versus U.S. waters, allocating more events to Canada to account for the increased mortality risk associated with heavy Canadian snow crab gear. A815. Given the density of lines in U.S. waters, including "large[] diameter lines

24

and long traps/trawl configurations," however, the Service determined that "significant risk occurs on both sides of the border." *Id.* The Service also noted that Canadian survey efforts significantly increased beginning in 2017 and recognized that "relative differences in survey effort" may be driving recent data trends. A481.

The Service also considered whether mitigation measures implemented in both countries should affect the inter-country allocation. A815. This information was also inconclusive. Canada implemented additional mitigation measures between 2017 and 2021, *see* A683-86, and the Service expects them to be effective, A927. But because these measures have been in effect for only a limited time, the Service determined it could not accurately calculate their benefit at this time. A815, 927.

In the end, given "limited distribution information and transboundary fishery attributes," even the best available data did not yield a conclusive allocation method. A815. Considering the available information taken together, then, the Service concluded that a "50/50 split represented the best available information." *Id.* The Service noted that "these methods were peer reviewed by the Center for Independent Experts, and while the reviewers did not come to consensus on accuracy, they considered the approach reasonable." *Id.*; *see* A1991-92.

The 50/50 may not have been perfect, but it was reasonable based on the available data and therefore passes muster under APA review. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) ("That a model is limited or

imperfect is not, in itself, a reason to remand agency decisions based upon it.").

Indeed, the First Circuit already concluded as much in its review of the Rule, which

applied the same even allocation as the Opinion. *See Dist. 4 Lodge,* 40 F.4th at 41.

Industry plaintiffs there made some of the same arguments they make here—word-

for-word, in some cases—and the court rejected each one, concluding that "[t]he

Agency's explanation and reliance on the peer-review panel is enough to pass

arbitrary-and-capricious review; we do not require perfect accuracy." *Id.*

Plaintiffs' arguments fare no better here. For one, many of their arguments

simply misconstrue the record. Plaintiffs assert, for example, that the Opinion

"blatantly ignored a decade of existing actual data in favor of opinions that are

unsupported," as well as comments urging the Service to rely on that data, because

the Service decided not to allocate mortalities between the countries solely based on

observed entanglements. ME Br. 16, *see id.* at 13-16. Here, Plaintiffs note that of

112 entanglements observed between 2010 and 2019, 49 resulted in mortalities, and

11 of those 49 mortalities could be attributed to a country with some certainty: 9

from Canada and 2 from the United States. ME Br. 13 (citing A450-51); NH Br. 13

(similar).[6] If Plaintiffs had their way, apparently, the Service would have used this

---

[6] Plaintiffs' figures come from the draft Opinion, which cited observed data collected between 2010 and 2019. A450-51. The final Opinion cited data collected between 2010 to *2018*, because total mortality data was not available for 2019. A813 n.26; *contra* Dist. 4 Br. 14 (asserting decision not to use 2019 data was unexplained).

small sample to allocate somewhere between 69 and 82 percent of mortalities of unknown geographic origin to Canadian gear. ME Br. 13.

Far from ignoring this data and the associated comments, the Service addressed them directly. The Service explained that apportioning more mortalities to Canada than the United States based simply on observed data would reflect only "relative differences in survey effort" and not the best available science. A480-81. The number of observed entanglements depends on surveys, so the fact that an entanglement is observed reflects only "whale distribution and search effort on both sides of the U.S.-Canada border," and may not accurately represent the larger body of unobserved entanglements. A480. Plus, as noted above, Canada started to conduct additional carcass-detection surveys in 2017. A299, 480-81, 1820; *see* A265 (describing reduced potential for carcass detection in U.S. waters relative to Canadian waters). The Service explained that it may have more information in the future about "the degree to which the observed [mortality and serious injury] data would have changed" with survey effort, but that "at present," it "does not believe there is sufficient information to support apportioning" more mortalities "to Canada simply because of relative differences in survey effort." A481.

Survey effort aside, the record makes clear that observed entanglement data is unlikely to represent the true rate or distribution of entanglement. *See, e.g.*, A814 (explaining that observed entanglements are "considered a minimum estimate, and

27

the actual entanglement rate is likely higher"); A683 ("Mortality and serious injury events are rarely observed where the initial entanglement occurs."); A1816 (discussing cryptic mortality). The First Circuit recognized this discrepancy in its order vacating the preliminary injunction of the Rule, explaining that the Service "acted reasonably in rejecting the implication that a lack of attribution suggests a lack of occurrence." *Dist. 4 Lodge*, 40 F.4th at 41 & n.1.

Nor was the Service required to "extrapolate from" the subset of observed entanglement data simply because it extrapolated from *other* datasets to estimate *other* values elsewhere in the Opinion. *Contra* MLA Br. 36; MALA Br. 11; Dist. 4 Br. 4, 6-8; ME Br. 13-14 & n.3. Indeed, it would have been arbitrary for the Service to apply a one-size-fits-all method to each analysis within the Opinion without regard to whether the method was appropriate in context. Plus, it makes no difference that the Service extrapolated from surveys in its study of other species, *see* ME Br. 19; more data is available for right whales than those species, allowing the Service to take a more nuanced approach in its right whale analyses. A812.

The Service also did not ignore the input and advice of peer reviewers. *Contra* ME Br. 15-16; MALA Br. 17-18; Dist. 4 Br. 12-14, 19-20. Per Plaintiffs, "multiple peer reviewers" recommended that the Service examine a different split because the right whale population had started to spend more time in Canadian waters. ME Br. 15 (citing A1991, 2023); *see* Dist. 4 Br. 13-14 (similar). Plaintiffs fail, however, to

28

acknowledge the portion of the review explaining that, despite "disagreement between reviewers on the best approach," past practice supported applying a 50/50 apportionment, which "is likely still . . . a conservative estimate of residency in US waters." A1992; *see id.* (recognizing that "certain data on which to base [] a different level of apportionment do not exist").

In any event, the Service considered the right whale's northern shift and provided three reasons for its conclusion that the right whale population still spends more time in U.S. than Canadian waters. A480. First, "only one concentration of right whales [is] known to occur at higher latitudes"; second, that concentration represents just over one third of the right whale population; and third, that concentration still spends at least half the year in U.S. waters. *Id.* Given that analysis, Plaintiffs' contention that the Service somehow ignored available data is unfounded. *See In re Polar Bear ESA Listing*, 709 F.3d 1, 10 (D.C. Cir. 2013).[7]

## B. The Service reasonably allocated all unknown-gear entanglements that resulted in mortality to trap/pot gear.

Plaintiffs next criticize the agency's decision to allocate all serious entanglements caused by unknown gear to trap/pot gear rather than gillnet gear. ME

---

[7] Because Plaintiffs raise the argument only in passing, MALA Br. 17, they have forfeited any challenge to the "Decision Support Tool," the model the Service used to calculate entanglement risks in particular areas, A810-11. In any event, the district court correctly upheld the Service's use of the tool. A232-33; *see also Dist. 4 Lodge*, 40 F.4th at 45-47 (holding similar challenge unlikely to succeed).

Brief at 17-22. Here, they contend that the Service "simply assumed that 100 percent of unknown entanglements are attributable to trap/pot gear." ME Br. 18; *see* MLA Br. 36; MALA Br. 11. The record shows otherwise. The Service carefully considered the data before it and explained why that data merited allocating all unknown-gear entanglements to trap/pot gear.

To decide how to allocate entanglements among gear types, the Service studied 107 entanglements observed between 2010 and 2018. A813-17; *see* A481-84. The Service could classify the gear type with certainty in only 25 of the 107 observed entanglements. A816. Most of that known gear was trap/pot gear. *Id.* (citing 17 instances of known trap/pot gear entanglements). More than half those confirmed trap/pot entanglements—9 of the 17—resulted in mortalities. *Id.* Gillnets and net gear, by contrast, were associated with only 8 of the observed entanglements, and together, that gear caused only 2.5 mortalities. *Id.* Most of the observed entanglements, however—82 in total—had no gear present or gear that could not "be identified to a particular gear type" and were thus categorized as gear "unknown." *Id.*

The Service recognized that it could have extrapolated from the observed entanglement data to assign mortalities caused by unknown-gear entanglements to particular gear types, but it decided not to for several reasons. A482, 817.

30

First, the Service had good reasons to conclude that most of the unknown-gear entanglements were caused by trap/pot gear. The "records indicate *line* was the predominant gear involved in cases with unknown gear and the majority of cases involved unknown gear." *Id.* (emphasis added). Indeed, half of the serious unknown-gear entanglements still included gear of some sort, and "with the exception of one, these cases all involved some type of line." A815-16; *see* A482-83. Although gillnet gear includes vertical lines, "99.7 percent of vertical lines in the action area are from trap/pot lines." A816-17; *see* A481-84. The Service further explained that gillnet-related entanglements were likely overrepresented in the observed data because "[i]nteractions that involve gillnet net panels may be more easily detected and identified on large whales." A483; *see* A816. Given this information, the Service concluded that "interactions with unknown line gear are much more likely to be from trap/pot gear than gillnet gear." A817.

Second, the Service concluded that gillnet gear does not present the same dangers to right whales as trap/pot gear. The data showed that interactions with net *panels* (the other element of gillnet gear) "may result in less severe injuries as the animal may be able to break free from the gear." *Id.* That theory comported with the observed entanglement data, which showed that only 2.5 of the 8 net entanglements resulted in mortalities. A816; *see id.* ("It is possible that the differences" in death

and serious injury figures "between trap/pot and gillnet gear are due to the ability of the animal to break free from sink gillnet gear.").

Plaintiffs flyspeck each of these rationales, but their critiques lack merit. Plaintiffs first cast the Service's statement that interactions involving "gillnet net panels may be more easily detected and identified" as a mere "supposition," which cannot stand in for the "best scientific and commercial data available." ME Br. 19. But the agency's statement about the possibility that gillnets may be overrepresented in the observed data was not the basis for the Service's decision, as Plaintiffs suggest. It was instead an acknowledgment about potential uncertainty in the relevant data, based on the agency's experience, made in the context of a broader discussion. *See* A483, 815-16. In any event, Plaintiffs cite nothing to suggest that the Service's statement was incorrect, rendering their critique toothless. *See Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001).

Plaintiffs next assert that the Service erred in attributing all unknown-gear entanglements to trap/pot gear, noting that gillnets were responsible for at least some of the known-gear entanglements. ME Br. 20; Dist. 4 Br. 14-17. As explained above, however, the Service decided not to attribute more entanglements to gillnets because nearly all the unknown gear retrieved included vertical lines, and 99.7 percent of the vertical lines in the federal fisheries are from trap/pot gear. A816-17. The Service did not overlook the role played by gillnet gear; it simply decided based on the data

that gillnet gear was less likely to be responsible for serious unknown-gear entanglements than was trap/pot gear. *Id.*; *see* A822, 923 (distinguishing between trap/pot and gillnet entanglements in final calculation).

Moreover, the fact that the Service used a different approach in a prior analysis based on different available data, *see* Dist. 4 Br. 16, does not undermine the Service's analysis of the data here. Again, Plaintiffs may disagree with the Service's methods, but they identify no data that the Service disregarded. *See In re Polar Bear*, 709 F.3d at 3 (rejecting challenges "amount[ing] to nothing more than competing views about policy and science").[8]

Plaintiffs next argue that the district court must have erred in stating that the Service "explained that vertical lines are the principal cause" of the mortalities, because the Opinion text the court was referring to discussed "lines," not "vertical lines." ME Br. 20 (citing A226). But the district court was correct—the relevant discussion in the Opinion is all about vertical lines. *See* A815-16. It says right whales can be trapped in gillnet "vertical lines," and "the records indicate *that* gear"—that is, "vertical lines"—was documented in approximately half of the interactions with unknown gear. A816. Several sentences later, the Opinion says even where no gear

---

[8] The Service's decision not to "partition the entanglement data between the different trap/pot fisheries," Dist. 4 Br. 16 (quoting A823), is irrelevant. Plaintiffs do not assert that the Service should have distinguished among those fisheries.

was retrieved, "given the data, a portion of these cases likely also involve vertical line gear." *Id.*; *see* A483-84 (similar).

Plaintiffs also argue that the district court erred when it said "right whales interact with vertical lines from gillnets and trap/pot gear in rough proportion to their presence in the water," because the court did not also acknowledge that the gear is dangerous to whales only if whales are nearby. ME Br. 21 (citing A226). Perhaps the court could have been more precise. But Plaintiffs' point was not lost on the Service, which recognized that the "interaction rate with gear is based, at least in part, on the co-occurrence of species and the gear." A484, 816. The Service proceeded to explain that because nearly 100 percent of the vertical lines in the action area under study are from trap/pot lines, "interactions with unknown line gear are much more likely to be from pot/trap gear than gillnet gear." A484; *see* A807-08, 816-17 (recognizing that co-occurrence matters). Plaintiffs do not contend that whales are absent from the action area, so their critique carries no weight.

In short, because vertical lines from trap/pot gear are more lethal than gillnet gear, and because nearly all the lines in the Opinion's action area are from trap/pot gear, the Service did not act arbitrarily or capriciously in allocating all serious entanglements with unknown gear to trap/pot gear. A816-17; *see* A481-84.

**C.     The Service reasonably accounted for cryptic mortalities.**

Plaintiffs next assert that the Service "assume[d] away any natural mortality" when it decided to attribute all cryptic mortality to humans, thereby marginally inflating its calculation that federal fisheries are responsible for an average of about 4.7 right whale mortalities each year. ME Br. 22; *see* MLA Br. 17 (accusing the Service of assuming that "but for man, right whales that survive the calf stage achieve immortality"); MALA Br. 11 (similar). Plaintiffs' arguments miss the mark here too.

As explained above at pp.13-14, the Service included cryptic mortality in its calculation because the best available science shows that observed mortality data does not accurately reflect total annual mortalities. A810 & n.23; A1816.[9] When the Service added cryptic mortalities to its calculations, moreover, it did not reduce the total cryptic-mortality figure to account for "natural mortalities," explaining that "there is little evidence showing this to be a cause of right whale mortality except at the calf stage." A819; *see* A491. Indeed, studies confirm that humans are responsible for nearly all adult right whale mortalities. A1244 (concluding that deaths of non-calf right whales "are almost entirely due to anthropogenic causes"); A1889 (explaining that natural causes of death were found "only in calves"); A1367

---

[9] The prospect that right whales simply "migrated to Canadian waters," Dist. 4 Br. 17, is nonexplanatory, since the total population survey includes whales in both U.S. and Canadian waters. A922; *see also* A299-300 (rejecting similar argument).

("[T]here is very little evidence of natural mortality in adult [right] whales, likely due to shortened life spans associated with anthropogenic causes.").

This does not, of course, mean that right whales would never die absent human activity. It means only that human causes of death are so prevalent that adult right whales rarely, if ever, live long enough to experience natural mortality. Further the Service did not ignore the fact that right whale *calves* experience natural mortality. *See* A491, 819. The Service did not include those natural mortalities in its cryptic-mortality calculation, however, because the figures used to calculate cryptic mortalities relied on total population data for right whale *adults*. *See* A1810; SA8.

Right whale calves are not included in those population figures because, among other reasons, calves are difficult to distinguish from one another until they develop individualized markings, around six months of age. A1810; *see* SA16 (explaining that calves are added to the total population catalogue only "when their identifying features are photographed well enough to be subsequently matched"). Given this imprecision, the scientific literature on cryptic mortality treats the death of a right whale calf as a non-birth, not a death. A1810.

Plaintiffs would have preferred that the Service break down the cryptic-mortality calculations and attribute some of the cryptic mortality to natural causes, including "disease, predation, and lack of adequate prey." ME BR. 23. They also

cite several studies that allegedly undermine the agency's conclusion. *Id.* The studies do not help Plaintiffs.

The 2012 study Plaintiffs cite, for example, "examined large whale mortality data from the period 1970 to 2009" and allegedly concluded that 20 percent of the 122 right whale mortalities identified in that period were due to natural causes. ME Br. 22 (citing A1926-37). But this study relies exclusively on pre-2010 data, and the Service determined that "2010-2018 data represent the best available information to estimate future right whale interactions with the fisheries." A813; *see infra* pp.39-40. In any event, the figure that Plaintiffs cite included adult, subadult, and calf mortalities, and the study later explained that "[c]alves died significantly more often from non-human causes." A1931. This is consistent with the Service's analysis.

Another more recent study cited by Plaintiffs considered data gathered from 2013 to 2018, ME Brief at 23 (citing A1884-1914), and it also supports the Service's analysis. As Plaintiffs themselves put it, the authors of the cited study "identified the cause of mortality in 43 of the 70 cases examined" and concluded that of those, 12 percent were natural, "all involving right whale calves." ME Br. 23 (citing A1889).

Plaintiffs next allege that the Service and district court improperly concluded that "calf survival rates are unimportant to right whale population dynamics." ME Br. 24 (citing A229). Calf survival rates are obviously critical to population growth, and neither the Service nor the court concluded otherwise. But calf deaths are not

included in cryptic-mortality calculations, because, again, the death of a calf is documented in the cryptic-mortality literature as a non-birth, not a death. A1810.

Even if the Service were to reduce its calculation by some undefined nominal amount to include calf mortalities, moreover, the record would still support its conclusion that the federal fisheries adversely affect right whales and that the current death rate exceeds the species' potential biological removal level. When the Opinion was prepared, the right whale population could support only eight mortalities every 10 years. 86 Fed. Reg. 51,971. And at that time, the federal fisheries exceeded that level of mortality every *two* years. A822. Thus, the district court correctly recognized that the Service's decision not to account for potential natural cryptic mortalities did not materially affect its overall analysis. A229; *see Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1004-05 (D.C. Cir. 1997) (confirming that an agency's approach need not be "perfectly consistent with natural conditions" to be reasonable).

Finally, Plaintiffs suggest that the Service's decision not to account for natural mortality must be arbitrary because "common sense dictates that all species have the potential to succumb to non-anthropogenic sources of mortality," including disease, predation, and lack of adequate prey. ME Br. 23; *see* NH Br. 11. But the question is not how whales have the "potential" to die but what is actually killing them, and unquantified "common sense" is not reliable data. Plaintiffs identify no data that the

Service overlooked in determining that humans, not natural causes, are the actual cause of death for virtually all adult right whales. *See Shafer*, 992 F.3d at 1089. In any event, the Service considered other possible causes and explained its decision not to account for them in its cryptic-mortality figure. *See, e.g.*, A491, 796, 813, 1560. The Endangered Species Act requires nothing more.

### D. Plaintiffs' remaining criticisms of the Service's scientific analysis are unwarranted.

Plaintiffs' remaining critiques are similarly meritless. For example, Plaintiffs refer to the Opinion's analysis of right whale population trajectories and boldly assert that the Service "purposely manipulated its population model" to overstate declines. ME Br. 9; *see* Dist. 4 Br. 20 (similar). But the Service simply explained that population "model outputs very likely overestimate the likelihood of a declining population," and that exact precision was unnecessary because the figures were presented merely for comparative purposes, and not to "predict[] the actual future population trend of right whales." A926. This unremarkable statement evinces no data manipulation—the Service simply explained that the model was conservative in its outputs.

Nor did the Service "displace its best professional judgment" and ignore the potential benefits of Canadian mitigation measures. ME Br. 11; *see* MLA Br. 37; MALA Br. 11 n.3. The Service agreed that "measures taken by Canada are benefiting right whales," A518, but it also explained that it was "assuming there is

no positive impact" from those measures in the Opinion because they had not been in place for long enough to for their benefits to be accurately assessed, A927. The Service further explained that if the mitigation measures yield quantifiable benefits, then the Service will account for them in future rulemakings. A1075; *see supra* p.12. This was simply another example of the Service *applying* the best available science and its informed expert judgment, not displacing them. *See* A230-31.

Finally, the Service provided ample support for its conclusion that the change in oceanographic conditions that began in 2010 would continue. *Contra* MLA Br. 18, 22, 36; MALA Br. 11 & n.4. The Service explained that the regime shift that began in 2010 has persisted since then, and although this region has experienced similar shifts in the past, there is no "information available to suggest when" another shift may occur. A813; *see* A1091-1100. Peer reviewers agreed that it would be reasonable for the Service to use data collected between 2010 and 2018 to project future population trends, A1253-54, 1343, 1546, and Plaintiffs identify no superior data that the Service overlooked. *See In re Polar Bear*, 709 F.3d at 9.

* * *

In short, the Service completed a careful review of the best available scientific and commercial data, explained its methods, and reasonably engaged with data and comments recommending different methods. Plaintiffs have not shown that the Service's methods—much less its overall Opinion—were arbitrary or capricious.

## II.    The Service's approach complied with Section 7(a)(2) of the Endangered Species Act.

Plaintiffs next assert that, in lieu of applying the best available data, the Service instead applied a "worst-case scenario" approach and adopted a "conservative policy" that "systematically inflate[d] the fishery's effects on the right whale" and targeted the lobster fishery for overregulation. MLA Br. 1-3, 6, 22, 29, 31-32, 43; ME Br. 2, 8. This approach, they assert, caused the agency to cast aside "empirical information" and "ignore likely scenarios and the best available data," and amounted to a misreading of the statute. MLA Br. 25, 32, 39; *see id.* at 27-45; ME Br. 8-12; MALA Br. 6-18. This argument fails on multiple grounds.

Far from "ignoring" the best available data, "focus[ing] exclusively on worst-case scenarios," MLA Br. 38, or simply relying on "inaccurate" data, MALA Br. 9, the Service relied on the "best available commercial and scientific data." A804. In some instances, that data "include[d] a range of values," and in other instances, several "different analytical approaches may be applied to the same data set." *Id.* Thus, agency scientists were forced to "make assumptions to overcome the limits in [their] knowledge." *Id.* "When appropriate" in those instances, the agency "select[ed] the value that would lead to conclusions of higher, rather than lower, risk" to resolve "the uncertainty . . . in favor of the species." A814.

For example, the data regarding the allocation of mortalities between Canada and the United States was uncertain, so the Service applied a 50/50 allocation for the

reasons discussed above. *Id*. It did the same when it assumed that vessel strikes and entanglements would continue in Canadian waters at existing rates, even though Canada recently imposed new mitigation measures, because the measures had not been in place long enough for their benefits to be measured. A926-27. By contrast, the Service did *not* apply this conservative approach when it decided how to allocate mortalities between vessel strikes and entanglements, because it determined that the observed data collected between 2010 and 2019 was representative, such that it could directly extrapolate from that data an accurate breakdown of vessel strikes and entanglements. A817-18.[10]

    True, the Service said in several parts of the Opinion that it was "assum[ing] a worst case scenario" or otherwise making "conservative" assumptions to "give the benefit of the doubt to the species." A804, 926-27, 937, 939. But this was no "open admission of arbitrary noncompliance" MALA Br. 9, or concession that the Service was displacing data with presumptions or otherwise ignoring the Endangered Species Act, as Plaintiffs hyperbolically assert, *id.* at 6-9, 17; MLA Br. 17, 23, 34-38; Dist. 4 Br. 10. The Service evaluated the best available data and, when that data revealed two or more reasonably likely outcomes, the Service selected the more conservative one. Put another way, the Service evaluated a "worst-case scenario"

---

[10] The Service applied this split even though one of the studies it discussed would have assigned a higher percentage of mortalities to entanglements. A817; *contra* MLA Br. 38 (alleging that Service "focus[ed] exclusively on worst-case scenarios").

among the most likely scenarios, and only when necessary to resolve uncertainties. *See, e.g.*, A926-27.

The Service's decision to resolve uncertainties in favor of the critically endangered right whale was consistent with the Endangered Species Act. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174-75 (1978). The Act directs the Service to evaluate the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), but it does not direct the Service to draw a particular conclusion or apply a particular approach when that data presents uncertainty. That sort of fact-specific scientific determination is for the Service to make. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) (upholding Fish and Wildlife Service's decision to use a conservative modeling method, where the agency was "[f]acing great measurement uncertainty and a [species] population whose existence is threatened"); *see also*, *e.g.*, *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 923-24 (9th Cir. 2020) (confirming that agency's use of conservative assumptions was appropriate).

Nor is this approach confined to analyses conducted under the Endangered Species Act. Indeed, courts have approved similar approaches in other statutory contexts after finding them to be reasonable and supported by the record. *See, e.g.*, *Balt. Gas & Elec. Co.*, 462 U.S. at 103 (confirming in different context that agency appropriately "counteract[ed] the uncertainties" in its data "by balancing them with

43

an overestimate" on the other side of its analysis); *Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1050 (9th Cir. 2008) (similar).

The Service's approach was also consistent with longstanding agency guidance. The 1998 Endangered Species Act Consultation Handbook directs a consulting agency facing "significant data gaps" to either "extend the due date of the biological opinion until sufficient information is developed" or "develop the biological opinion with the available information giving the benefit of the doubt to the species." A1925.[11] The Service was unable to extend the due date for the Opinion here, *see supra* p.16, so it instead applied the latter approach. Courts have also acknowledged the appropriateness of giving "the benefit of the doubt to the species" in Section 7 analyses. *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); *Roosevelt Campobello Intern. Park Comm'n v. EPA*, 684 F.2d 1041, 1049 (1st Cir. 1982); *accord Tenn. Valley Auth.*, 437 U.S. at 174.

Plaintiffs' strained reading of Section 7 and the regulations, MLA Br. 45-53; MALA Br. 6-9, does not show otherwise. Here, Plaintiffs assert that because Section 7(a)(2) directs action agencies to ensure that their actions are "not *likely* to jeopardize the continued existence of listed species," 16 U.S.C. § 1536(a)(2) (emphasis added), the Service "must focus on probable scenarios as revealed by the best available data,

---

[11] The Handbook was developed after notice-and-comment rulemaking, 60 Fed. Reg. 8,729 (Feb. 15, 1995), and is entitled to substantial weight, *see Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009).

not the most improbable" ones. MLA Br. 28-29; *see id.* at 43; MALA Br. 6-8 (similar). The Service agrees that Section 7(a)(2) does not require the study of remote or speculative effects or possibilities, and so it did not study them here. *See supra* pp. 41-42.

More to the point, Plaintiffs' suggestion that Section 7(a)(2)—and specifically its use of the word "likely"—somehow limits a consulting agency's discretion in the face of scientific uncertainty has no grounding in the statutory text. The reference to "likely" was added in 1979 merely to "soften[] the obligation on an agency from requiring the agency to 'insure' the species would not be jeopardized to requiring the agency to 'insure' that jeopardy is not 'likely.' " *Roosevelt Campobello*, 684 F.2d at 1048-49 (discussing Pub. L. No. 96-159 § 4(1)(c) (1979)). It means only that the agency no longer has to prove an absolute negative, so long as it ensures that the negative is not *likely* to occur. The relevant text says nothing about how an agency must handle uncertainties in the data, however, nor does it limit the sorts of conclusions agencies may draw when they face such uncertainty.

The regulations likewise provide no support for Plaintiffs' position. *Contra* MLA Br. 29-31; MALA Br. 14-15. To be sure, 50 C.F.R. § 402.14(g) directs the Service to "evaluate the effects of the action and cumulative effects on listed species," and 50 C.F.R. § 402.02, in turn, defines "effects of the action" and "cumulative effects" as those that "are reasonably certain to occur." The Service

45

agrees with Plaintiffs that the phrase "reasonably certain to occur" means that the agency need not consider remote or speculative effects. MLA Br. 30-31; *see* 84 Fed. Reg. 44,976, 44,992-93 (Sept. 26, 2019) (explaining that the "reasonably certain to occur" standard is narrower than the National Environmental Policy Act's "reasonably foreseeable" standard because the Endangered Species Act does not require the same "expanded review of . . . effects"). Thus, the Service identified the worst-case scenario among the most likely ones. *See supra* p.42. Most importantly, these provisions also do not tell the Service how to evaluate uncertain data.

Plaintiffs' misreading of the regulatory text reaches its pinnacle with the argument that the Service is "prohibited from considering" the fisheries' effects on right whales because those effects are allegedly "so remote in time" and "only reached through a lengthy causal chain that involves too many steps" as to make them "not reasonably certain to occur." MLA Br. 30 (citing 50 C.F.R. § 402.17(a)-(b)). The relevant regulation says nothing about what the Service may or may not consider in its analysis; it only tells the Service how to distinguish between activities that are reasonably certain to occur (and thus must be studied under Section 7) and those that are not reasonably foreseeable and, thus, need not be studied. There is no doubt that the federal fisheries are operating and directly affect right whales, and the Service was not only allowed—but *obligated*—to consider those effects.

Plaintiffs would also have the court believe that by resolving data uncertainties in favor of the endangered whales where appropriate, the Service attempted to "resurrect" a version of the Endangered Species Act that existed before it was amended in 1979. MLA Br. 37; *see* MLA Br. 32-34. As noted above, Section 7(a) as it was originally enacted directed agencies to "insure" that their actions "do not jeopardize" listed species, and it did not reference use of the best available science. Pub. L. No. 93-205 § 7 (1973). In 1979, Congress changed "jeopardize" to "not likely to jeopardize" and also added language directing agencies to "use the best scientific and commercial data available" in its analyses. Pub. L. No. 96-159 § 4.

As Plaintiffs see it, those amendments transformed the Endangered Species Act from a statute designed to protect endangered species to a statute simply intended to "test proposed agency actions based on the best data to determine risk in likely scenarios." MLA Br. 39. Plaintiffs are wrong. The intent of the 1979 amendments was to relax Section 7 slightly, while "continu[ing] to give the benefit of the doubt to the species." *Roosevelt Campobello*, 684 F.2d at 1049 (quoting H. Conf. Rep. No. 96-697 at 12 (1979)); *see Conner*, 848 F.2d at 1454. Subsequent cases have confirmed as much. *Roosevelt Campobello*, 684 F.2d at 1049 (confirming that agencies "continue to be under a substantive mandate" to "prevent the loss of any endangered species"); *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 478 n.13 (3d Cir. 1997) (explaining that "[n]othing in the amendments or their history

47

suggests that Congress intended . . . to deflate its prioritization of endangered species by returning equitable discretion to the courts"). These nearly 45-year-old amendments do not aid Plaintiffs' novel interpretation of the Act.

Plaintiffs also incorrectly suppose that the Service "felt compelled to apply its approach because of a 'fleeting' statement" in a House Conference Report. MLA Br. 37-39 (citing A804). Here, Plaintiffs refer to a page in the Opinion referencing the same report cited in *Roosevelt Campobello* and *Conner* in the context of a discussion about giving the benefit of the doubt to the endangered whale. *See supra* p.47. The Service's approach finds ample support in the record and the law; Plaintiffs cannot ignore that support by fixating instead on a single reference to legislative history in the Opinion's scientific analysis.

The fact that neither the statute nor the regulations address the actual point of dispute between Plaintiffs and the Service—how the Service should resolve uncertainty in the best available data before it—shows Plaintiffs' statutory argument for what it is: an effort to repackage flawed record-based challenges into legal ones. For the reasons already discussed, Plaintiffs' challenges cannot overcome the deferential arbitrary-and-capricious standard of review. Plaintiffs may not evade that standard by recasting their arguments as an attack on the Service's compliance with the Endangered Species Act, when the statute sets a substantive standard but does

not address how the Service should resolve uncertainties in the data to which the standard is applied.

Finally, Plaintiffs' attempts to show that the Service's approach somehow "infect[ed]" its Opinion, MLA Br. 28, are unsuccessful. As explained in Part I, the Service studied the best available scientific and commercial data and drew reasonable scientific conclusions, supported by the record, when it calculated how many right whale mortalities are attributable to the federal fisheries each year. Plaintiffs' unelaborated suggestions that the Service's country and gear allocation analyses and cryptic-mortality calculations were flawed because the Service resolved uncertainties in favor of the whale, MLA Br. 36; ME Br. 8-12; MALA Br. 10-11 & n.3, fail for the reasons described above.

\* \* \*

In sum, the Service's decision to resolve certain scientific uncertainties in the best available data in favor of the endangered right whale was an appropriate exercise of its expertise, found support in the record, and was consistent with the Endangered Species Act.

## III. The Framework complied with the Endangered Species Act.

As explained above, the Service's Protected Resources Division determined early in the preparation of the Opinion that, "[g]iven the declining status of the . . . right whale, these federal fisheries will need to continue to reduce their impact on

49

the species over time to meet both [Endangered Species Act] and Marine Mammal Protection Act mandates." A531; *see* A447. Thus, "[c]onsistent with common practice for developing information related to protected species interactions in fisheries," the Protected Resources Division worked with the Sustainable Fisheries Division to develop the Framework and modify the action under review. A447. The Sustainable Fisheries Division was well within its authority when it agreed to modify its action to include the Framework. *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994) (explaining that Congress "intended to enact a broad definition of agency action" in the Endangered Species Act and anticipated that projects may have to be altered to satisfy the Act); *Lane Cty. Audubon Soc'y v. Jamison,* 958 F.2d 290, 294 (9th Cir. 1992) (concluding that agency's multi-stage timber-management strategy should be considered an agency action for purposes of Section 7 review).

Plaintiffs disagree and assert that development and adoption of the Framework during the consultation process (as opposed to evaluating the effects of authorizing the fisheries without conservation measures—even though it was clear such authorization would fail the relevant standard—and then developing mitigation measures after the fact) was an inappropriate "end-run" around the Endangered Species Act's procedures. MLA Br. 45-53.

50

Their arguments fail on multiple grounds. For one, Plaintiffs present the Framework as something it is not. It imposes no "crippling" and "economically debilitating conservation restrictions," MLA Br. 19, 26, 47, at all, much less "the most unreasonable and imprudent," or "the most stringent" ones, MLA Br. 46; *see* MALA Br. 2, 4, 20, 24, 50; ME Br. 2; NH Br. 4; MSCC Br. 8-12 (marching through similar parade of horribles). Instead, the Service will implement the Framework using an adaptive approach, working with stakeholders on the take reduction team—including representatives from the lobster industry—to ensure that continued authorization of the fisheries complies with both the Marine Mammal Protection Act and the Endangered Species Act. A1071-77. Nor will the Service's authority to implement the Framework be "limitless," MLA Br. 48. Plaintiffs will be able to challenge subsequent rulemakings just as they could challenge any other rulemaking. *See, e.g.*, *Dist. 4 Lodge*, 40 F.4th 36.

Plaintiffs next assert that, if the agencies were following the proper procedures, then, under the Endangered Species Act's "considered scheme," the agency action would have remained unchanged until the end of the consultation, at which point the Protected Resources Division would have reached a jeopardy determination. MLA Br. 47-48. As Plaintiffs see it, the Protected Resources Division would then have an opportunity to identify economically reasonable or prudent alternatives, and the Sustainable Fisheries Division would then consider whether to

51

adopt them. Alternatively, the Protected Resources Division could have denied authorization to proceed, at which point the Endangered Species Committee ("the Committee") could grant an exemption. *Id*.

Plaintiffs misinterpret the Endangered Species Act and its implementing regulations. To start, they err in suggesting that, if the Service had waited for a jeopardy determination, then some statutorily required test for economic "necessity or proportionality" would have applied. MLA Br. 45; *see id.* at 47 (citing *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 474-75 (4th Cir. 2013)); *see* MSCC Br. 16-28. To be sure, the regulations define "reasonable and prudent alternative[s]" as those that, among other things, are also "economically and technologically feasible." 50 C.F.R. § 402.02. But this does not mean that any modifications to a proposed action must pass a certain cost-benefit threshold, as Plaintiffs suggest, MLA Br. 46-47. It means only that the Service must consider the economic feasibility of any alternatives it identifies. *See Dow*, 707 F.3d at 475. The Service has not evaded any required economic analysis here, and it will consider additional economic concerns when it implements the Framework via future rulemakings. *See, e.g.*, 86 Fed. Reg. 51,977 (considering economic implications of Rule).

The Committee procedure, which Plaintiffs reference for the first time on appeal, *see* MLA Br. 48-49, also does not advance their position. If a jeopardy biological opinion is issued and the action agency "determines that it cannot comply

with the requirements of Section 7(a)(2) after consultation," 50 C.F.R. § 402.15(c), then it may appeal to the Committee for an exemption, 16 U.S.C. § 1536(e)-(h); *see* 50 C.F.R. § 451.02. The Committee is chaired by the Secretary of the Interior, composed of largely Cabinet-level officials, *id.* § 1536(e), and must follow a complex multi-step process before granting any exemption, *id.* § 1536(g), (h). It has been convened only six times since 1978 and has authorized only two exemptions. Pervaze A. Sheikh, CRS Report R40787, Endangered Species Act: The Exemption Process, at 1 (Jan. 27, 2017).

Congress planned for the Committee to be a last resort, not a regular step in the consultation process, as Plaintiffs suggest, *see* MLA Br. 47-48. Indeed, the legislative history confirms that Congress envisioned "[m]any, if not most, conflicts between the Endangered Species Act and Federal actions" being "resolved by full and good faith consultation between the project agency" and the consulting agency. H.R. Conf. Rep. No. 95-1804, at 18 (1978). The Committee was supposed to be invoked "only in those instances where the consultation process has been exhausted and a conflict still exists." *Id.*; *see* S. Rep. No. 95-874, at 3 (1978) (explaining that "when conflicts with the Endangered Species Act are known or should be known, an agency must consult immediately with [the consulting agency] and exhaust all reasonable avenues for eliminating the conflict").

Thus, when the Service's Protected Resources Division and Sustainable Fisheries Division developed the Framework and tailored the proposed action to meet the statutory requirements, the process worked as it was supposed to. A447-48, 531. After all, action agencies have broad discretion to define and modify their proposed actions. *See Pac. Rivers Council*, 30 F.3d at 1054-55; *Lane Cty.*, 958 F.2d at 294. The Sustainable Fisheries Division was under no obligation to wait until the Protected Resources Division had finalized its review before modifying its action, and Plaintiffs' suggestion that it was only invites delay. Put another way, this was not a "fail[ure] to adhere to the procedural requirements," MLA Br. 45; it was good government at work.

Moreover, the Committee would not have helped Plaintiffs even if the Service had waited until the very end of the consultation process and *then* adopted the Framework—or any other conservation measures—as a reasonable and prudent alternative. There would be no conflict to resolve in that case and thus no reason for the Service to appeal to the Committee. *See* 16 U.S.C. § 1536(h)(1)(A)(i); 50 C.F.R. § 402.15(c). And although private permittees may request an exemption if requested permits are denied, *see* 16 U.S.C. § 1536(g)(2)(A); 50 C.F.R. § 451.02(e)(3)(ii), no permits were denied here. Plaintiffs' recourse would therefore be in court, not before the Committee.

Further, the Committee exempts activities only from the Endangered Species Act, not the Marine Mammal Protection Act—a statute squarely at issue here but relegated to a footnote in MLA's brief, *see* MLA Br. 13 n.2. As explained above at pp.11-12, the Service developed the Framework to ensure that the continued authorization of the federal fisheries would comply with not only the Endangered Species Act, but the Marine Mammal Protection Act as well. A447. Thus, any exemption granted by the Committee would have taken Plaintiffs only so far.

The zone-of-interests discussion in *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997), also does not aid Plaintiffs. *Contra* MLA Br. 8, 24, 34, 48; MSCC Br. 3-4, 15, 20-21. There, the Court held that the plaintiffs' harms fell within the Endangered Species Act's zone of interests because the Act's "best scientific and commercial data" requirement was intended to prevent "needless economic dislocation" and "uneconomic (because erroneous) jeopardy determinations," and the plaintiffs claimed they were "victims of such a mistake." *Bennett*, 520 U.S. at 176-77. The Court's conclusion that plaintiffs alleging economic harms fall within the Act's zone of interests does not aid these Plaintiffs in their effort to transform Section 7(a)(2)'s scientific analysis into an economic one.

Finally, the "major questions doctrine," referenced by Plaintiffs in passing for the first time on appeal, plays no role here. *See* MLA Br. 50 (citing *West Virginia v. EPA*, 142 S. Ct. 2587 (2022)). The Service was well within its authority when it

55

developed an adaptive regulatory framework to ensure the federal fisheries can operate in compliance with both the Endangered Species Act and the Marine Mammal Protection Act. Its decision to develop that Framework during consultation, rather than wait until the Opinion was final, was consistent with both the letter and the spirit of the Endangered Species Act. The major questions doctrine applies only in "extraordinary" cases, *West Virginia*, 142 S. Ct. at 2608, and this record-review case is not one of them.[12]

## CONCLUSION

For those reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Sommer H. Engels*

TODD KIM
*Assistant Attorney General*

Of Counsel:

ANDREW C. MERGEN
RACHEL HERON
JOHN ALMEIDA
J. BRETT GROSKO
MARK CAPONE
TAYLOR A. MAYHALL
SAM DUGGAN
SOMMER H. ENGELS
*Attorney-Advisors*
*Attorneys*
NOAA Office of General Counsel
Environment and Natural Resources Division
Gloucester, Massachusetts
U.S. Department of Justice

December 20, 2022
90-8-6-08503

---

[12] Because this Court does not entertain arguments presented only by amici, *Eldred v. Ashcroft*, 255 F.3d 849, 851 (D.C. Cir. 2001), this brief does not address the assorted "constitutional concerns" discussed by the Maine State Chamber of Commerce. MSCC Br. 29-31.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,985 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Sommer H. Engels*
SOMMER H. ENGELS

Counsel for Federal Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2022, I electronically filed the above brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Sommer H. Engels*
SOMMER H. ENGELS

Counsel for Federal Appellees