**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 24, 2023**
No. 22-5238
(Consolidated with 22-5244, 22-5245, and 22-5246)

IN THE

# United States Court of Appeals
# For the District of Columbia Circuit

MAINE LOBSTERMEN'S ASSOCIATION

*Plaintiff-Appellant*,

DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 207, STATE OF MAINE DEPARTMENT OF MARINE RESOURCES, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION,

*Intervenors-Appellants*,

*v.*

NATIONAL MARINE FISHERIES SERVICE, GINA M. RAIMONDO, in her official capacity as Secretary of Commerce; JANET COIT, in her official capacity as Assistant Administrator, NOAA Fisheries,

*Defendants-Appellees*,

CONSERVATION LAW FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE,

*Intervenors-Appellees.*

On Appeal from the United States District Court
for the District of Columbia in Case No. 1:21-cv-02509, Hon. James E. Boasberg

**Reply Brief of Intervenor-Appellant District 4 Lodge of the International Association of Machinists and Aerospace Workers, Local Lodge 207**

Alfred C. Frawley IV
Thimi R. Mina
McCloskey, Mina, Cunniff & Frawley, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805


*Attorneys for Intervenor-Appellant District 4 Lodge of the International
Association of Machinists and Aerospace Workers, Local Lodge 207*


January 10, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………….ii

GLOSSARY………………………………………………………………………..iii

SUMMARY OF THE ARGUMENT…………………………………………….1

ARGUMENT……………………………………………………………………….1

      *A.*    *Judicial Deference is Not Unlimited……………………………...…..2*

      *B.*    *The First Circuit's Decision in District 4 Lodge v. Raimondo is Not Controlling…………………………………………4*

      *C.*    *The Defendants' Arguments Concerning Gillnets and Risks Posed by Other Fisheries ring Hollow…………………………7*

      *D.*    *NMFS's Analysis – or Lack thereof – of Cryptic Moralities was Arbitrary and Capricious……………………………..8*

CONCLUSION…………………………………………………………………...10

CERTIFICATE OF COMPLIANCE…………………………………………...11

CERTIFICATE OF SERVICE………………………………………………….12

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Spear*, 520 U.S. 154 (1997)……………………………………………..1

*Cape Cod Hosp. v. Sebelius*,
    630 F.3d 203 (D.C. Cir. 2011) ...........................................................2

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)............................................................................2

**\*\*District 4 Lodge v. Raimondo**,
    40 F.4th 36 (1st Cir. 2022) ....................................................... 1, 4, 6

*Greater Yellowstone Coal, Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) .........................................................3

*Humane Soc'y of the United States v. Pritzker*,
    75 F. Supp. 3d 1(D.D.C. 2014) ......................................................2

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................8

## Regulations

50 C.F.R. § 402.14(g)..........................................................................5

86 Fed. Reg. 51,976 ............................................................................9

86 Fed. Reg. 51,993…………………………………………………………..9

86 Fed. Reg. 51,987 ............................................................................6

86 Fed. Reg. 52,006…………………………………………………………..6

# GLOSSARY

**A:**            Joint Appendix

**BiOp:**         Biological Opinion

**ESA:**          Endangered Species Act

**MLU:**          Maine Lobstering Union

**M/SI:**         Mortality/Serious Injury

**NMFS:**         National Marine Fisheries Service

## SUMMARY OF THE ARGUMENT

The Defendants incorrectly suggest that judicial deference allows agency's such as NMFS to rely on rudimentary assumptions when the best data available is incomplete.  Its peer reviewers have said the opposite.  But leaving the issue of deference aside, the Defendants' response briefs do not support unfettered reliance on the First Circuit's decision in *District 4 Lodge v. Raimondo*, 40 F.4th 36, 41 (1st Cir. 2022), NMFS's decision to allocate 50% of all entanglements to U.S. waters, the agency's assumption that all M/SI events are caused by lobster trap/pot gear in the Northeast, or that entanglements in lobster gear are the sole cause of so-called cryptic mortalities.  By utterly ignoring major aspects of the problem, NMFS has not only acted arbitrarily and capriciously, it has violated the fundamental tenant of administrative law that agencies must "avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives."  *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).

## ARGUMENT

In addition to the arguments set forth in the initial briefs and replies of the Maine Lobstermen's Association, the Maine Department of Marine Resources, and the Massachusetts Lobstermen's Association, which the MLU adopts and incorporates herein by reference, the MLU offers the following reply to the Defendants' arguments.

1

### A.    Judicial Deference is Not Unlimited.

Contrary to what the Defendants seemingly suggest, judicial deference "is not unlimited." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971). While the Court certainly must "defer to the agency's technical expertise in areas of scientific specialization, the Court is not required to ignore simple probability." *Humane Soc'y of the United States v. Pritzker*, 75 F. Supp. 3d 1, 12 (D.D.C. 2014). To that end, the Court must ensure that an agency actually applied its "expertise in a reasoned manner" before affording it any deference, even where (and especially when) the matter at hand is highly technical and scientific. *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 216 (D.C. Cir. 2011). Put another way, experts not using their expertise are not acting as experts.

Were this a case where NMFS had made highly technical apportionments of entanglements and M/SI events among various causes and locations based on its scientific analysis and application of the best available data, NMFS's decisions would be entitled to deference. But this is not what happened here. Here, NMFS ignored observed entanglement data (necessarily the best available) and rudimentarily assumed that half of all entanglements occurred in U.S. waters and that *all* M/SI events in U.S. waters were caused by lobster trap/pot gear. Although gillnets, trap/pot gear used in other fisheries, and natural causes are all known sources of right whale mortality – the only debate is over the extent of that mortality

2

vis a vis the lobster fishery – NMFS did not allocate any responsibility for the entanglement problem whatsoever to these sources.

To be sure, the process of attributing *all* M/SI events to a single source, and splitting all entanglements equally between two countries, was not a scientific one. Instead, it was little more than the proverbial flipping of a coin in order to reach a simplistic result on an expedited timeframe. *See Greater Yellowstone Coal, Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) (Where an agency is uncertain about the effects of agency action, it may not rely on "substantial uncertainty" to justify its actions when deferring to such an approach would amount to no more than "deferring to a coin flip") (internal quotation marks and citation omitted).

Moreover, any deference to NMFS's conclusions is undermined by the fact that the agency's own peer reviewers – the "experts" from which NMFS derives its expertise in the first place – actually warned *against* deferring to NMFS's allocations of M/SI events among nations, causes and fisheries. To use the peer reviewers' own words, NMFS's approach was "not fully transparent or coherent," A1992; did "not seem to have much supporting evidence," A1252; "does not reflect the current shift in NARW distribution," A2023; and "lacks the rigor to be sufficiently robust to support the types of decisions being considered." A1980. These are not the sort of findings that support judicial deference, particularly when actual data exists that undermines NMFS's allocations.

### B.     The First Circuit's Decision in *District 4 Lodge v. Raimondo is Not Controlling.*

The Defendants rely heavily on the First Circuit's decision in *District 4 Lodge v. Raimondo*, 40 F.4th 36, 41 (1st Cir. 2022).  For the reasons that follow, that opinion should not control this Court's deliberations.

First, NMFS notes that the First Circuit found that "[t]he Agency's explanation and reliance on the peer-review panel is enough to pass arbitrary-and-capricious review." *District 4 Lodge v. Raimondo*, 40 F.4th at 41.  But the First Circuit did not have the benefit of an administrative record or the substance of any of the actual peer reviews, i.e., the *proof* that could justify NMFS's entitlement to deference in the first place.  Instead, the First Circuit simply trusted NMFS's representation that its peer reviewers found the agency's approach to be "reasonable." *Id.* (citing A815).  As noted above, however, NMFS's subjective characterization of its peer reviewers' conclusions is undermined by the actual verbiage employed by the peer reviewers themselves.  When the First Circuit Court deferred to the agency's modeling techniques (or, more accurately, the agency's characterization of the peer reviews of those techniques), it was unaware that the actual experts on the ground found that NMFS's approach "g[a]ve the reader a sense of precision or accuracy that is not the case and could be misleading to the public or the end-users of the tool." A1962-63.  No court should knowingly defer to any

4

agency action that is misleading.

Second, in reaching its limited decision on the propriety of the closure of some 960 square miles of fishing grounds in the Gulf of Maine, the First Circuit did not reach many of the issues raised by the Plaintiffs in these proceedings. These issues include (but are certainly not limited to) the all-important questions of whether: 1) the agency improperly relied upon a "worst-case scenario" approach, A804, rather than on the most "reasonably certain" scenario presented by the best scientific and commercial data available, 50 C.F.R. § 402.14(g); 2) the 2021 BiOP's Conservation Framework unlawfully evaded the ESA's consultation requirements; 3) NMFS could properly assess levels of "cryptic mortality" by focusing only on possible undetected entanglements in the face of evidence that other causes of "cryptic mortality" – including natural deaths and the departure of the right whale population from the agency's traditional survey areas – were also at play; 4) NMFS ignored the impacts of gillnets and gear deployed by other fisheries on the right whale population; and 5) NMFS employed its modeling for purposes that the agency was specifically warned were improper. These issues are all a matter of first impression for this Court.

Third, the Defendants point to the First Circuit's finding that NMFS "acted reasonably in rejecting the implication that a lack of attribution suggests a lack of occurrence" as support for their position that "the record makes clear that observed

entanglement data is unlikely to represent the true rate or distribution of entanglement." Fed. App. Br. at 27-28 (quoting *Dist. 4 Lodge*, 40 F.4th at 41 & n.1). What the First Circuit failed to recognize (because it did not have a developed record) is that the agency *did* use observed data to allocate 77% of all unknown causes of M/SI events in U.S. waters to entanglements and 23% to vessel strikes. A817-18. Neither NMFS nor the First Circuit has ever explained why observed data is sufficiently reliable to apportion M/SI events between the two primary anthropogenic causes of right whale mortalities but is *not* sufficiently reliable to apportion these events between the countries and/or fisheries where the observed cases occurred. Indeed, the only reason why NMFS used observed data to apportion one data set but not the other was to mask the fact that it did not 1) consider *any* risks posed by gillnets in implementing its regulations, 86 Fed. Reg. 52,006; 2) even *attempt* to evaluate the impact of *any* fishing activities in the southern states, 86 Fed. Reg. 51,987; and 3) analyze the effectiveness of *any* mitigation measures it has imposed on the American lobster fishery since 2009. A267. NMFS cannot claim that its assumptions are preferable to the best available data when it did not even attempt to gather the data that the agency was lacking.

## C.    *The Defendants' Arguments Concerning Gillnets and Risks Posed by Other Fisheries Ring Hollow.*

NMFS attempts to defend its decision to allocate *all* unobserved M/SI events

6

in U.S. waters to lobster trap/pot fishing gear in the Northeast, rather than allocate a portion of those events to gillnets or to trap/pot gear used in other fisheries, by claiming that "the Service decided not to attribute more entanglements to gillnets because nearly all the unknown gear retrieved included vertical lines, and 99.7% of the vertical lines in the federal fisheries are from trap/pot gear." Fed. App. Br. at 32. NMFS argues that the Court cannot disturb its finding "that gillnet gear was less likely to be responsible for serious unknown-gear entanglements than was trap/pot gear." *Id.* at 32-33.

This argument might have some merit had the agency allocated at least *some* responsibility for entanglements to gillnets (or other trap/pot fisheries). In that case, the Plaintiffs would be hard pressed to argue that NMFS "overlook[ed] the role played by gillnet gear" because the agency would have acknowledged that gillnets play at least *some* role in causing right whale mortalities. Fed. App. Br. at 32-33. But in *this* case, NMFS allocated *no* M/SI events to gillnet gear (or other trap/pot fisheries), despite the fact that the best data available conclusively establishes that both gillnets and vertical lines employed by non-lobster fisheries – particularly those in southern states where right whales aggregate and breed – cause at least *some* entanglements. A816. While NMFS might have some latitude in deciding how much of that "some" should be allocated among the various fisheries based on the lack of available data, it did not have latitude to refuse to make *any* apportionment

whatsoever to *known* causes of entanglements simply because other entanglements have no known cause.  Ignoring such important aspects of the problem by offering an explanation "that runs counter to the evidence before the agency" is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### D.    NMFS's Analysis – or Lack Thereof – of Cryptic Mortalities was Arbitrary and Capricious.

Finally, NMFS's consideration of the sources of cryptic mortalities suffers from similar flaws.  Although the agency claims it did not assign any cryptic mortalities to natural causes because "studies confirm that humans are responsible for nearly all adult right whale mortalities," Fed. App. Br. at 35, NMFS fails to recognize that "nearly all" is not the same as the entirely "all."  According to NMFS itself, the best available data indicates natural causes are responsible for between 10-20% of all right whale mortalities.  A1243 ("Over a period of 40 years, 1970-2009 inclusive, ~80% (70 of 87) of [right whale] mortalities for which the cause of mortality is known . . . were anthropogenic . . . With almost no observations from any other sources of mortality, a reasonable inference is that the vast majority of non-calf female [right whale] mortality is anthropogenic."); A1889 (noting that 38 of 43 cases (88%) where cause of death could be determined were anthropogenic).  The fact that human beings may cause the *majority* of adult right whale deaths does

not give the agency license to ignore the fact that not *all* deaths are anthropogenic, particularly when increased climate change comes with "increased susceptibility to disease and contaminants." A796-97. Even factoring in a 10% natural death rate would have preserved hundreds of jobs and informed more realistic and scientifically-sound risk reduction targets. If the agency wants to fix a problem, it needs to consider *all* important aspects of that problem, not "nearly all" of them.

Moreover, while the agency perfunctorily dismisses as "nonexplanatory" the MLU's argument that many cryptic mortalities are really the result of their migration into un-surveyed waters, Fed. App. Br. at 35 n.9, the fact that NMFS's total population survey includes *some* whales in Canadian waters does not mean that its survey accounts for the *majority* of whales in Canadian waters. Indeed, NMFS does not dispute that there is "insufficient survey effort" for NMFS to "distinguish between true mortality and the appearance of mortality that would come from an individual permanently leaving the survey areas," 86 Fed. Reg. 51,976, 51,993, or that "resighting rates of individual whales have been declining in the past few years" due to changes in critical habitat and reduced surveying resources. A1808. The fact that the agency's brief does not even attempt to engage with the possibility that right whales it can no longer locate were not killed by lobster gear in the Northeast but instead have relocated to waters off Canada, Greenland and the deep Atlantic concedes the validity of the MLU's argument that at least *some* portion of cryptic

9

mortality is the result of insufficient survey effort.

## CONCLUSION

In a case such as this, where NMFS expects the lobster industry to reduce the

risk of entanglement by nearly 100%, every aspect of the problem is important. By

ignoring all possible causes of the problem other than entanglements in U.S. lobster

trap/pot gear, NMFS has placed an impossible burden on the lobster industry – and

by extension, the hardworking men and women of the State of Maine – to eradicate

all possible threats to the North Atlantic right whale, even the ones it does not cause.

Dated at Portland, Maine this 10th day of January, 2023.

Respectfully Submitted,

/s/    Alfred C. Frawley IV
Alfred C. Frawley IV
Thimi R. Mina

MCCLOSKEY, MINA, CUNNIFF & FRAWLEY, LLC
12 City Center
Portland, Maine 04101
207.772.6805
207.879.9375
tmina@lawmmc.com
afrawley@lawmmc.com

*Counsel for District 4 Lodge of the
International Association of Machinists and
Aerospace Workers, Local Lodge 207, f/k/a,
IAMAW Maine Lobstering Union – Local
207*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this document contains 2,938 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as well as the recommendations of the Court in its Handbook of Practice and Internal Procedures at IX.A.6, because this brief has been prepared in Times New Roman 14-point font using Microsoft Word.

/s/ Alfred C. Frawley IV
ALFRED C. FRAWLEY IV
MCCLOSKEY, MINA, CUNNIFF &
FRAWLEY, LLC
12 City Center
Portland, ME  04101
(207) 772-6805
afrawley@lawmmc.com

January 11, 2023

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of January, 2023, I filed the foregoing with the Clerk of the United States Court of Appeals for the District of Columbia Circuit via the CM/ECF system, which will serve notice of this filing to all counsel of record via ECF.

/s/    Alfred C. Frawley IV
Alfred C. Frawley IV